Scott P. Klosterman (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:   (307) 265-0700
Facsimile:    (307) 266-2305
E-Mail:        sklosterman@wpdn.net

Attorney for Plaintiff

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

FEB 23 2012

Stephan Harris, Clerk
Casper

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| HEALTHTECH MANAGEMENT SERVICES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. ☰ 12 cr042-F |
| PAUL CARDWELL, | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, by and through its undersigned attorney, brings this *Complaint and Demand for Jury Trial* against the above-named Defendant.  In support thereof, Plaintiff alleges as follows:

## I.   JURISDICTION AND VENUE

1.   This Court has jurisdiction over the subject matter of this *Complaint* pursuant to 28 U.S.C. § 1332(a)(1), because the matter in controversy exceeds the sum and value of $75,000, exclusive of interests and costs, and is between citizens of different states.

2.   This Court has personal jurisdiction over Defendant pursuant to WYO. STAT. § 5-1-107(a) which conveys personal jurisdiction over Defendant because the exercise of personal jurisdiction over Defendant is not inconsistent with the Wyoming or United States Constitution.

3.   Pursuant to 28 U.S.C. § 1391(b)(2), proper venue for this case is the United States District Court for the District of Wyoming because the acts and omissions complained of herein occurred within the District of Wyoming.

## II.   PARTIES

4.   Plaintiff, HealthTech Management Services, Inc. (hereinafter, "HealthTech"), is an Oregon corporation having its principal place of business in Franklin, Tennessee.

5.   Defendant, Paul Cardwell, is a citizen of the United States and, upon information and belief, currently is domiciled in the nation of Thailand. At all times relevant to this complaint, upon information and belief, Defendant was domiciled in Indiana or Wyoming.

### III.   FACTUAL BACKGROUND

6.      HealthTech provides management services to various hospitals throughout the United States, typically pursuant to an agreement for management services in effect between HealthTech and the particular client hospital. Among other management services provided to a client hospital, HealthTech in some cases identifies and provides an individual to serve at the client hospital as the Chief Executive Officer ("CEO") of that hospital.

7.      The individual serving as CEO for a hospital typically has a tripartite character. First, the individual has the powers and authority of an officer, specifically, the CEO, of the hospital. Second, the individual is a HealthTech employee for all purposes, including payroll, benefits, supervision and discipline. Third, the individual serves as HealthTech's on-site, hospital-based agent in carrying out the CEO responsibilities under HealthTech's agreement for management services with the hospital.

8.      At all times relevant to this Complaint, Powell Valley Healthcare, Inc. d/b/a Powell Valley Hospital (hereinafter, "PVHC") owned and operated a Wyoming non-profit acute-care hospital based in Powell, Wyoming and was a longstanding client of HealthTech's pursuant to successive agreements for management services. An Agreement for Management Services entered into as of November 1, 2010 (hereinafter, the "Management Agreement") was in effect at most times relevant to this Complaint. A copy of the Management Agreement is attached hereto as **Exhibit "A"** and incorporated herein by reference.

9.     Pursuant to the Management Agreement, HealthTech was obligated, among other things, to provide PVHC with a CEO and to provide "supervision and effective management of the day-to-day business operations of [PVHC] through the CEO." The Management Agreement, therefore, contemplated that the CEO would be HealthTech's agent for carrying out HealthTech's core responsibilities under the Management Agreement.

10.    After an application process, and with the approval of PVHC, Defendant was selected by PVHC to fill the position of CEO for PVHC. Pursuant to a letter agreement signed and dated February 10, 2011 by Defendant, Defendant accepted HealthTech's offer to become a HealthTech employee to serve as CEO of PVHC. A copy of the letter agreement is attached hereto as **Exhibit "B"** and incorporated herein by reference. The letter agreement created an at-will employment contract between Defendant and HealthTech.

11.    Defendant started employment with HealthTech, serving as CEO for PVHC, on or about March 7, 2011. Pursuant to HealthTech's job description for his position, Defendant thereby had "onsite CEO-level oversight responsibility for management and operation of a facility [PVHC] under a management agreement with HealthTech . . . ." Defendant was HealthTech's agent for purposes of carrying out the CEO responsibilities under the Management Agreement.

12.    Pursuant to his job description, Defendant also was expected to demonstrate "highly ethical and moral conduct in personal and professional action and communication, consistent with the goals and objectives of" HealthTech.

4

13.    By virtue of, among other things, his job description and his agent-principal relationship with HealthTech, Defendant owed HealthTech a fiduciary duty in carrying out his duties as a HealthTech employee and as HealthTech's agent in carrying out its Management Agreement with PVHC.

14.    An implied covenant of good faith and fair dealing was applicable with respect to Defendant's at-will employment contract with HealthTech

15.    In violation of his fiduciary duty and the implied covenant of good faith and fair dealing, shortly after arriving at PVHC to assume the duties of CEO, Defendant implemented a scheme to deceive HealthTech and PVHC, to deprive HealthTech of Defendant's highly ethical and moral conduct for which HealthTech contracted, and to defraud PVHC and improperly embezzle and misappropriate PVHC funds in an amount of not less than $847,934.

16.    The scheme consisted primarily of Defendant: (a) using his actual or purported authority to cause PVHC to make payments to a purported vendor (the "Straw Company") for services which, as Defendant then and there well knew, had not been and never would be rendered; and (b) secretly requesting and receiving back from the Straw Company a substantial part of the funds the Straw Company had received from PVHC. In particular, Defendant caused PVHC to issue checks payable to the Straw Company, a longstanding personal acquaintance in Indiana (hereinafter, the "Indiana acquaintance"), purportedly for recruiting services provided by the Straw Company (through the Indiana acquaintance) to aid in recruiting physicians and non-physician personnel to PVHC,

when Cardwell knew that in fact no such recruiting services would be performed and that no portion of the purported recruiting fees would be legitimately earned.

17.    To cause PVHC to issue payments to the Straw Company, and to conceal the fact that such payments were fraudulent, Defendant deceived HealthTech and various PVHC employees by, among other things and at various times between March 2011 and September 2011: (a) representing the Straw Company to be a legitimate recruiting firm, and representing the Indiana acquaintance and the Indiana acquaintance's wife to be recruiters for the Straw Company, when in fact, as Defendant then and there knew, neither the Indiana acquaintance, his wife, nor the Straw Company ever did or would perform recruiting services; (b) concealing the fact that the Indiana acquaintance was in fact a longstanding personal acquaintance rather than a mere legitimate business contact; (c) personally authoring emails regarding purported, but in fact non-existent, recruiting efforts and then making the emails appear to have come from the Indiana acquaintance; (d) using those emails, in part, to justify the issuance of payments to the Straw Company; and (e) after being requested by PVHC and HealthTech to provide documentation to support the issuance of payments to the Straw Company, presenting PVHC and HealthTech with purported contracts with, and invoices from, the Straw Company, knowing full well that the documents were inauthentic and gave the false impression that the Straw Company actually intended to and did engage in recruiting efforts on behalf of PVHC.

18.    As a result of his successful acts of deception, Defendant caused PVHC to issue 12 checks in a total amount exceeding $847,000 between April 2011 and September

2011, before Defendant resigned from his position as PVHC's CEO (and thus his employment with HealthTech) on September 23, 2011. In return for these payments, as Defendant knew would be the case, PVHC received neither recruiting services from the Straw Company nor anything else of value.

19.    In order to ensure that he, personally, and not just the Indiana acquaintance, profited from Defendant's deception of HealthTech and PVHC and Defendant's fraudulent embezzlement and diversion of PVHC funds, Defendant directed the Indiana acquaintance to send Defendant a substantial portion of the funds that the Indiana acquaintance had received via PVHC checks payable to the Straw Company. Beginning not later than August 2011, in accordance with Defendant's instructions, the Indiana acquaintance secretly kicked back funds to Defendant, typically via electronic funds transfer to accounts controlled by Defendant.

## COUNT I – BREACH OF FIDUCIARY DUTY

20.    Paragraphs 1-19 above are hereby incorporated as though set forth in full herein.

21.    Defendant has violated his fiduciary duty to HealthTech as set forth above and to be further exposed in discovery and shown at a trial of this matter.

22.    As a direct and proximate result of Defendant's breach of his fiduciary duty, HealthTech has sustained and continues to sustain extensive damages in an amount in excess of $75,000 to be determined at trial.

## COUNT II – BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING (CONTRACT)

23.     Paragraphs 1-22 above are hereby incorporated as though set forth in full herein.

24.     The implied covenant of good faith and fair dealing is inherent in every commercial contract and requires that neither party to the contract commit an act that would injure the rights of the other party to receive the benefit of the contract during its performance.

25.     The at-will employment contract is a valid and enforceable contract between HealthTech and Defendant.

26.     Defendant violated the covenant of good faith and fair dealing implied in his at-will employment contract with HealthTech and injured HealthTech's right to receive the benefits of the agreement during its performance.

27.     As a direct and proximate cause of Defendant's breach of the implied covenant of good faith and fair dealing, HealthTech has sustained and continues to sustain extensive damages in contract in an amount in excess of $75,000 to be determined at trial.

## IN THE ALTERNATIVE, COUNT III – BREACH OF THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING (TORT)

28.     Paragraphs 1-27 above are hereby incorporated as though set forth in full herein.

29.     In the event that a valid and enforceable at-will employment contract does not exist between HealthTech and Defendant, HealthTech pleads in the alternative a claim for breach of the implied covenant of good faith and fair dealing based in tort.

30.     Defendant and HealthTech had a special relationship of trust and reliance arising from, among other things: (a) Defendants' unique positioning as onsite agent of HealthTech for carrying out HealthTech's obligations under the Management Agreement; and (b) HealthTech's affording Defendant separate consideration, including extra leave time, to which Defendant otherwise would not have been entitled, intended to help Defendant retain his position as a HealthTech employee serving as CEO at PVHC.

31.     Defendant violated the implied covenant of good faith and fair dealing and injured HealthTech's right to receive the benefits of the agreement during its performance.

32.     As a direct and proximate cause of Defendant's breach of the implied covenant of good faith and fair dealing, HealthTech has sustained and continues to sustain extensive damages in contract in an amount in excess of $75,000 to be determined at trial.

**WHEREFORE**, Plaintiff prays:

A.     That proper process issue and be served upon the Defendant, requiring him to appear and answer within the time provided by law;

B.     That the Court enter judgment in HealthTech's favor on each and every count of the Complaint;

C.     That the Court award HealthTech judgment on its claims for relief for actual damages in an amount to be proven by the evidence at trial;

D.     That the Court award HealthTech judgment on its claims for relief for punitive damages as is allowed by law against Defendant;

E.     That the Court award Plaintiff its attorneys' fees, costs, and expenses incurred; and

F.     That the Court order any and all other legal and equitable relief to which Plaintiff may be entitled.

## DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, by and through its undersigned counsel and pursuant to FED. R. CIV. P. 38 demands trial by jury on all claims of this *Complaint* so triable.

DATED this 23rd day of February, 2012.

HEALTHTECH MANAGEMENT
SERVICES, INC., Plaintiff


Scott P. Klosterman (#6-3081)
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400
P.O. Box 10700
Casper, WY 82602-3902
Telephone:     (307) 265-0700
Facsimile:     (307) 266-2306
E-Mail:        sklosterman@wpdn.net

Attorney for Plaintiff

# EXHIBIT "A"

AGREEMENT FOR MANAGEMENT SERVICES

<u>Parties</u>

THIS AGREEMENT FOR MANAGEMENT SERVICES is entered into as of the 1st day of November 2010, by and between Powell Valley Healthcare, Inc., an acute care hospital licensed in the State of Wyoming with its offices located at 777 Avenue H, Powell, Wyoming 82435 ("Hospital") and HealthTech Management Services, Inc., an Oregon corporation with its offices located at 105 Westwood Place, Brentwood, Tennessee 37027 ("HTMS").

<u>Recitals</u>

A.     Hospital provides acute general inpatient and outpatient services, nursing home services, and community health services as established by Hospital's governing board (the "Board").

B.     Hospital requires the services of an experienced chief executive officer ("CEO"), along with such management and services described herein, necessary for the administration of Hospital.

C.     Hospital desires to obtain HTMS's services, and HTMS agrees to provide a CEO, along with such management and other services described herein, upon the terms and conditions set forth herein.

<u>Agreement</u>

NOW, THEREFORE, for good and valuable consideration and incorporating the recitals set forth above, Hospital and HTMS agree as follows:

1

## ARTICLE I
## SERVICES AND DUTIES

1.1     Engagement. Hospital retains HTMS to provide, and HTMS agrees to provide, the managerial services described herein.

1.2     Authority and Responsibility of HTMS. The Board authorizes HTMS, on the Board's behalf, to exercise, in accordance with written policies of the Board, the reasonable business judgment of a hospital management company in the discharge of its duties hereunder, including supervision and effective management of the day-to-day business operations of Hospital through the CEO. HTMS agrees to carry out such responsibilities in accordance with Hospital policy, rules and regulations and applicable law and to oversee that Hospital has appropriate systems to coordinate such Hospital policies, rules and regulations with patient care, financial management and medical education. Any powers not specifically delegated or granted by the Board to HTMS will remain with the Board. Except as otherwise noted herein, and in particular Section 4.3, all duties of HTMS hereunder shall be exercised through the CEO, or if one is engaged hereunder, the Interim CEO. Specifically, HTMS, through the CEO, shall have responsibility and commensurate authority, subject to the terms of this Agreement, the direction and prior approval of the Board, the written policies of the Board, and the budgets approved by the Board as hereinafter provided, to lawfully and reasonably ensure that the Hospital has in place appropriate systems and personnel to carry out the following activities:

1.2.1   Personnel Administration. HTMS shall:

(a)     Provide CEO-level oversight of the recruitment, hiring, promotion, discharge, supervision, disciplining and management of all employees of Hospital (including employed physicians), including overseeing that the Hospital has appropriate systems in place to administer compliance with the policies, rules, regulations, and compliance programs adopted by the Board, and including providing information and recommendations for the determination

2

from time to time of the numbers and qualifications of employees needed in the various departments and services of Hospital to promote efficiency and quality patient care, in accordance with the Board-approved policies and budgets of Hospital; provided, however, that HTMS's supervisory and management authority shall not extend to any aspect of such employees' professional medical judgment or medical actions, and provided further that HTMS shall not have responsibility for the wages, benefits, withholding, payroll taxes, and other expenses associated with such employees, nor shall HTMS have any liability for the acts or omissions of such employees.

(b)     Provide information to and recommendations for third party support of Hospital's human resources department's administration of wage scales, rates of compensation, employee benefits, rates and conditions of employment, in-service training, attendance at seminars or conferences, staffing schedules and job and position descriptions with respect to all employees of Hospital according to Board policies.

1.2.2   Collection of Accounts. HTMS shall provide CEO-level oversight of the collection of accounts and monies owed to Hospital, provided, however, that HTMS shall not have any authority to develop substantive billing or coding policies for the Hospital, which authority shall remain with the Board, and provided further that HTMS shall not provide any billing or coding services to Hospital under this Agreement.

1.2.3   Payment of Accounts and Indebtedness. HTMS shall provide CEO-level oversight of the payment of payroll, trade accounts, amounts due on short- and long-term indebtedness, taxes and all other financial obligations of Hospital; provided, however, that HTMS's responsibility under this paragraph shall be limited to the exercise of reasonable diligence and care to apply the funds collected in the operation of Hospital to its financial obligations in a timely and prudent manner.

3

1.2.4    Accounting and Financial Records.  HTMS shall provide CEO-level oversight of the establishment and administration of accounting procedures and controls, in accordance with generally accepted accounting principles, and provide CEO-level oversight of the establishment and administration of systems for the development, preparation and safekeeping of records and books of account relating to the business and financial affairs of Hospital (the originals to remain at Hospital), all subject to Board review.  Included in the foregoing will be the following:

(a)    Preparation and delivery to the Board at the first regular board meeting occurring at least twenty (20) days after the end of each calendar month, of a balance sheet, dated the last day of such month, and a statement of income and expenses for such month relating to the operation of Hospital.

(b)    Within sixty (60) days after the end of each fiscal year of Hospital, preparation and delivery to the Board of a balance sheet, dated the last day of said fiscal year, and a statement of income and expenses for the year then ended.

(c)    From time to time, as may be required by law or determined to be needed, preparation and filing of accounting forms and reports under any federal, state or local law.

(d)    HTMS shall, through the CEO, as applicable, oversee that Hospital prepares its annual cost reports in connection with reimbursement under Medicare, Medicaid, Blue Cross and other third party payment contracts and programs, in which Hospital may from time to time participate; provided, however, that Hospital, shall have ultimate responsibility for the submission of its cost reports.  Once prepared, all cost reports shall be submitted to the Board for approval.

1.2.5    Depositories for Funds.  HTMS shall, in accordance with the state laws of Wyoming, provide CEO-level oversight of the maintenance of accounts, including certificates of deposits, in such banks, savings and loan associations and other financial institutions as the

Board may from time to time select with such balances therein (which may be interest bearing or non-interest bearing) as HTMS shall from time to time deem appropriate. All such bank accounts shall be maintained in the name of Hospital and controlled by the Hospital in accordance with applicable Medicare reassignment rules. Checks withdrawing funds from said bank accounts and said depositories shall be signed only in a manner determined from time to time by the Board.

1.2.6   <u>Purchase Agreements</u>.

(a)     To the extent available, subject to applicable law and to HTMS's membership criteria, HTMS shall offer Hospital access to purchasing agreements in which HTMS may from time to time participate. Hospital agrees to utilize the purchasing agreements for products and services available through the program whenever reasonable. Hospital acknowledges that the overall commitment and utilization of the purchasing agreements by Hospital will affect HTMS's ability to maximize savings to Hospital.

(b)     All purchases shall be in the name of Hospital and comply with Hospital's procurement rules. Hospital shall be solely responsible for payment therefore, and HTMS shall not be deemed a merchant with respect thereto, within the meaning of the applicable provisions of the Uniform Commercial Code enacted in the State of Wyoming or of other applicable provisions of law. Any purchase agreement with an annual expenditure in excess of fifty thousand dollars ($50,000.00) or a term in excess of twenty-four months, which has not previously been approved as part of the annual budgeting process shall be subject to prior approval of the Board.

1.2.7   <u>Maintenance of Licensure and Certification</u>. The CEO shall direct Hospital's efforts to maintain its licenses and certifications in good standing, provided that the Hospital has the ultimate responsibility to obtain and maintain in good standing such licenses and certifications.

1.2.8   Charges.  Make recommendations, as appropriate, for third party support concerning the establishment, maintenance, revision and administration of the overall charge structure of Hospital pursuant to pertinent regulations, including, but not limited to, patient room charges, charges for all ancillary services, charges for supplies, medication and special services.

1.3     Budgets.  Not later than thirty (30) days prior to the end of Hospital's fiscal year during the existence of this Agreement, HTMS shall submit to the Board for approval the following budgets covering Hospital's operations for the next fiscal year:

1.3.1   Capital Expenditures.  A capital expenditure budget outlining a program of capital expenditures for the next fiscal year.

1.3.2   Operating Budget.  A budget setting forth an estimate of operating revenues and expenses for the coming fiscal year, together with recommendations regarding operation of the Hospital on a sound financial basis and an explanation of anticipated significant changes from previous year, which may include facility utilization, changes in services offered to patients, charges to patients, payroll rates and positions, non-wage cost increases and other factors.

1.3.3   Cash Flow Projection.  A projection of cash receipts and disbursements based upon the proposed operating and capital budgets, together with recommendations as to the use of projected cash flow in excess of short-term operating requirements and/or as to the source and amounts of additional cash flow that may be required to meet operating requirements and capital requirements.

1.4     Contract Services.  Subject to any applicable legal and regulatory requirements, applicable Board policies, and budgets as defined in Section 1.3 above, HTMS shall be empowered to negotiate, enter into, terminate, and administer on behalf of Hospital and in the name of Hospital, such contracts as are necessary for the operation of Hospital, including without limitation contracts for equipment, drugs, supplies and other materials and services, and for maintenance and repair of the physical plant of Hospital; provided, however, that HTMS shall not execute the following types of contracts without the specific prior approval of the Board:

6

1.4.1    Collective bargaining contracts;

1.4.2    Contracts for the purchase or lease of real estate;

1.4.3    Physician contracts and guarantees (including, but not limited to, recruitment agreements, etc.)

1.4.4    Any contract with an annual expenditure in excess of fifty thousand dollars ($50,000.00) or a term in excess of twenty-four months which has not previously been approved as part of the annual budgeting process.

1.5      Management Support Services.  HTMS shall review, monitor, and recommend managerial improvements or changes in the following areas of Hospital's operations, provided, however, that HTMS shall not provide any marketing or advertising services to Hospital under this Agreement:

1.5.1    Administration. Management systems for Hospital departments.

1.5.2    Management Training and Development. Education and training programs shall be encouraged, including at the department head level and those supporting nursing, accounting and business office functions.

1.5.3    Nursing. HTMS shall provide a corporate nursing specialist to advise and consult with administration, nursing administration, Hospital's designated nursing in-service personnel and others as appropriate.

1.5.4    Periodic Board Education programs.

1.5.5    Labor Management. Productivity management programs, through which HTMS shall review and make recommendations regarding utilization of labor and standards for performance according to the particular needs and circumstances of Hospital and its departments.

7

1.5.6    Quality Assurance and Risk Management Programs.

1.5.7    Joint Commission or State Survey Preparedness.

1.5.8    Financial Operations.

1.5.9    Business Office.

1.5.10   Material Management and Purchasing.

1.5.11   Other Hospital Departments (as mutually agreed to by HTMS and the Board).

1.5.12   Strategic and Financial Planning, including:

        (a)    Market analysis;

        (b)    Business planning;

        (c)    Medical staff development planning, which shall include consideration of objectively identifiable community needs and information to the Board regarding recruitment of medical staff.

1.5.13   Facilities review, as requested by the Board and agreed to by HTMS, under which HTMS shall recommend a third party to analyze the existing Hospital facilities program and ongoing special studies and projects and advise in connection therewith. The fee for any new architectural and engineering studies shall be negotiated by the Hospital and any third party providing such studies.

    1.6    <u>Special Projects Not Included</u>.  At the Board's request, any special projects, such as physician recruitment, marketing surveys and/or studies, financial feasibility studies for new financing for Hospital or a major portion thereof or other work not specifically included in HTMS's obligations hereunder, may be performed pursuant to written agreements to be separately negotiated by the parties from time to time.

1.7    Good Faith. Although the parties recognize and acknowledge that HTMS is not able to, and does not, guarantee any particular results under this Agreement, HTMS agrees to act in good faith and use commercially reasonable efforts in performing all of its obligations under this Agreement.

1.8    Limitation of Warranties. HTMS HEREBY DISCLAIMS AND EXLUDES ALL WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED (WHETHER ARISING UNDER LAW OR EQUITY OR CUSTOM OR USAGE), INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, WITH REGARD TO ANY SUPPLIES, GOODS OR SERVICES PROVIDED TO THE HOSPITAL UNDER THIS AGREEMENT OR THROUGH THE GROUP PURCHASING PROGRAM AND THE HOSPITAL EXPRESSLY WAIVES RELIANCE UPON ANY SUCH WARRANTIES. HOWEVER, NOTHING IN THIS SECTION SHALL BE INTERPRETED TO LIMIT OR MODIFY ANY CLAIM WHICH THE HOSPITAL, AS AN ORIGINAL PURCHASER, MAY HAVE AGAINST THE MANUFACTURER OR SUPPLIER (OTHER THAN HTMS) OF ANY SUPPLIES, GOODS AND SERVICES.

ARTICLE II
EMPLOYEES

2.1    General. Except for the position of CEO, all operating and service personnel as necessary for the proper operation and maintenance of Hospital shall be employees of Hospital. Notwithstanding the fact that HTMS may have authority under this Agreement to direct or supervise certain non-medical aspects of Hospital's employees, each Hospital employee shall remain the responsibility of Hospital. Each Hospital employee shall be on Hospital's payroll and shall continue to receive employee benefits in accordance with Hospital's policies. No Hospital employee shall have any claim under this Agreement, or otherwise, against HTMS for vacation pay, sick leave, employment insurance, worker's compensation, disability benefits or employee benefits of any kind.

2.2    HTMS Provided Personnel.

9

2.2.1   <u>HTMS Personnel at Hospital</u>. In furtherance of its obligations under this Agreement during the term hereof, HTMS shall place at Hospital an employee of HTMS to act as Hospital's CEO.  At the time of placement at Hospital, and throughout the term of this Agreement, the CEO shall be an at-will employee of HTMS, subject to all policies and procedures of HTMS, and shall be paid by HTMS.  The CEO shall perform the usual and customary functions of a hospital CEO's position subject to appropriate direction from the Board.  In that respect and in addition to other applicable responsibilities described earlier in this Agreement, the CEO of the Hospital has a CEO's responsibility for and has commensurate authority to lawfully and reasonably accomplish the duties set forth below subject to direction by the Board:

(a)     Exercise CEO-level supervision of Hospital's internal affairs and maintain order and discipline in the Hospital, for the efficient operation and management of thereof.

(b)     Provide CEO-level oversight that Hospital carries out objectives established, approved and/or authorized by the Board.

(c)     Recommend a detailed annual management plan for the operation of Hospital to the Board.

(d)     Develop an appropriate organizational structure to facilitate achievement of the annual management plan.

(e)     Solicit community acceptance of Hospital's programs and services and promote an excellent public image for the Hospital.

(f)     Keep the Board informed as appropriate on a continuing basis with the progress and phases of Hospital's activities, attend meetings of the Board, refer to the Board matters of major importance relative to the growth and development of Hospital for the purpose of securing Board decision or authorization, and comply with the Board's policies regarding employees, medical staff and the general public.

(g)   Recommend to the Board a long-range plan that establishes the direction and methodology for achievement of the overall objectives of Hospital approved by the Board. Coordinate the provision of new facilities or services approved by the Board in accordance with the community needs, institute planning schedules for Hospital's affairs based on continued reevaluation of Board-approved objectives and results, and coordinate these items with capital requirement plans.

(h)   Conduct periodic performance reviews of those personnel directly accountable to the CEO.

(i)   Act as a source of authority in matters pertaining to major management decisions and help coordinate the activities of the medical staff with Hospital.

(j)   Develop cooperative relationships with other hospitals for the exchange of information and services, with community agencies to develop an understanding of Hospital's programs and with professional organizations and other groups.

(k)   Foster effective relationships with the medical staff in a manner that is consistent with the Board's overall objectives.

(l)   Coordinate such representation and involvement as is deemed appropriate and necessary by the Board in national, state and local hospital association boards, planning agencies, consumer groups and related health agencies or groups.

(m)   Recommend for the Board's consideration Hospital policy positions concerning national and state legislation, government administrative policies and other matters of public policy.

(n)   Review and secure Board approval of financial and other major reports directed to Hospital's community.

2.2.2   Placement of HTMS Employees at Hospital. Prior to placing a CEO at Hospital, HTMS shall communicate with the Board to establish the qualifications and initial salary

11

range for the CEO to be so placed. Thereafter, HTMS shall seek to identify candidates for the position to be placed that fit such desired qualifications within the established salary range. Upon identifying appropriate candidates acceptable to HTMS and the Board, HTMS shall present HTMS's recommended candidate to the Board for approval. If the recommended candidate is acceptable to the Board, HTMS shall promptly seek to employ the recommended candidate. If, however, such candidate declines HTMS's offer of employment, HTMS shall so notify the Board and shall meet with the Board to present an alternate candidate or to establish expanded parameters for the recruitment of further candidates for the position.

2.2.3   Personnel Compensation. The CEO, as an employee of HTMS, shall be paid a salary or hourly wage by HTMS and, in addition thereto, shall receive benefits from HTMS in accordance with HTMS's then standard policies regarding the provision of benefits to its employees. Hospital shall reimburse HTMS for such salary and benefits by paying to HTMS, an amount equal to the sum of the salary for the CEO, together with ▬▬ percent ▬▬ thereof to pay for benefits and the administration thereof. In addition, Hospital shall reimburse HTMS for the following costs and expenses incurred by HTMS in connection with the CEO: (i) travel, lodging, meals, and other out-of-pocket expenses associated with the recruitment of candidates for the position of CEO; (ii) costs and expenses associated with relocating the successful candidates for the position of CEO; and (iii) the cost and expenses for severance pay associated with the termination of the CEO in accordance with the following guidelines:

(a)     Hospital shall reimburse HTMS for the cost and expenses for severance pay associated with the termination of the CEO if, without documented cause ("Documented Cause") the CEO is (i) terminated upon mutual agreement of the parties or (ii) removed from Hospital at the request of Hospital. It is specifically agreed between Hospital and HTMS that the CEO is an employee of HTMS, and not Hospital, and that nothing herein shall be construed in any manner to make the CEO a Hospital employee for any purpose whatsoever.

12

(b)     For the purpose of this section, the following shall constitute Documented Cause:

    (i)     Any acts of willful misconduct; gross negligence of the CEO's duties; continual failure to comply with established policies or procedures approved by the Board; willful disruption of hospital operations; acts of fraud; violation of law or regulation (except minor traffic offenses) deemed by the Board and HTMS to be adverse to the best interest or reputation of the Hospital; unauthorized disclosure or use of trade secrets or other confidential information used commercially or competitively; and conviction of a felony or any situation involving moral turpitude that Hospital and HTMS mutually determine renders the CEO unsuitable for continued employment.

(c)     In the event the CEO is terminated without Documented Cause, the CEO shall be eligible for one of the following three severance alternatives, which alternative shall be selected by Hospital at its option:  (i) six months' notice of CEO termination during which time period the CEO shall continue to function as CEO for the Hospital, or (ii) severance in an amount equal to six months of the CEO's base salary and benefits plus an additional month's salary for every year of service as CEO to Hospital up to six years of service (such severance in no event to exceed twelve (12) months' salary and benefits), or (iii) a combination of notice of CEO termination and severance that provides the CEO at least six months' income following the date of such notice.  Any award of severance to the CEO is due only upon execution by the CEO of a release agreement ("Severance Agreement") in a form satisfactory to HTMS and Hospital, the approval of which shall not be withheld unreasonably.

(d)     Hospital shall reimburse HTMS for the cost and expenses of the severance in monthly payments and HTMS shall pay such to the CEO in accordance with HTMS's normal payroll practices.

(e)     Such severance payments to CEO shall be discontinued if the CEO obtains terms of employment or a contract position making at least the base pay received prior to

receiving the severance allowance. At Hospital's option, Hospital may require that the Severance Agreement provide that if the CEO finds employment at a lesser salary, the severance amount will be re-calculated to be the difference between the base salary at Hospital and the CEO's new salary. In addition, at Hospital's option, Hospital may require that the Severance Agreement provide that if the CEO accepts interim employment, the severance will be so adjusted during the interim assignment. Prior to executing any Severance Agreement HTMS shall submit the proposed Severance Agreement to Hospital for Hospital's review and approval and for Hospital's consideration of whether or not to exercise Hospital's options as referenced in this Section 2.2.3(e).

2.2.4    Interim CEO.  If there is a vacancy in the CEO position, a temporary, interim chief executive officer ("Interim CEO") shall be assigned by HTMS to Hospital, until a regular CEO is recruited and placed as described in Section 2.2.2 herein. Such Interim CEO, as an employee of HTMS, shall be paid a salary by HTMS and, in addition thereto, shall receive benefits from HTMS in accordance with HTMS's then standard policies regarding the provision of benefits to its employees.  Hospital shall reimburse HTMS for such salary and benefits by paying to HTMS an amount equal to HTMS's costs and other expenses associated with such temporary assignment of an Interim CEO which costs and expenses shall include, without limitation, the salary or hourly wage paid by HTMS to such employee, together with an applicable amount (not more than ███ percent (██) thereof) to pay for benefits and administration thereof.  In addition, Hospital shall reimburse HTMS for the reasonable travel, lodging, meals, local transportation, and other out-of-pocket expenses which are related to the Interim CEO's duties.

2.2.5    Hospital shall pay for travel, lodging, meals, and other out-of-pocket expenses of the CEO when they are attending meetings or conferences on behalf of Hospital, subject to Board policy.

2.3    Non-Solicitation and No-Hire Covenant.

14

(a)   Hospital.  During the term of this Agreement and for the period of one year beginning with the date this Agreement terminates, whether upon its expiration or by earlier termination, Hospital shall not, directly or indirectly, through subsidiary or affiliated companies or separate employee lease or staffing companies or otherwise, solicit for employment or hire any person to work at the Hospital who is employed by HTMS at the time of such solicitation or hire, nor shall Hospital solicit for employment or hire any person who provided services at Hospital as an employee of HTMS within one year of Hospital's solicitation or hire, whether or not such employee is employed by HTMS at the time of such solicitation or hire; provided, that this provision shall not apply to persons who were employed by Hospital immediately prior to their employment by HTMS.  In the event HTMS terminates the Agreement or elects not to renew the Agreement at the end of the normal term of the Agreement, Hospital may solicit for employment the Hospital CEO employed by HTMS in such position as of the date of termination or non-renewal; provided, however, that such termination or non-renewal by HTMS is not based upon any default or breach of this Agreement by Hospital.

(b)   HTMS.  During the term of this Agreement and for the period of one year beginning with the date this Agreement terminates, whether upon its expiration or by earlier termination, HTMS shall not directly or indirectly, through subsidiary or affiliated companies or separate employee lease or staffing companies or otherwise, solicit for employment or hire any person to work for HTMS who is employed by Hospital at the time of such solicitation or hire, nor shall HTMS solicit for employment or hire any person who provided services at Hospital as an employee of Hospital within one year of HTMS's solicitation or hire, whether or not such employee is employed by Hospital at the time of such solicitation or hire; provided, that this provision shall not apply to persons who were previously employed by HTMS prior to

15

their employment with Hospital or were otherwise known to HTMS independent of HTMS's relationship with Hospital.

## ARTICLE III
## DIVISION OF AUTHORITY AND RESPONSIBILITY

3.1    The Board.  The full authority and ultimate control of Hospital shall at all times remain exclusively with the Board.  The Board shall retain all authority placed on it by law, its bylaws, and any other governing documents of Hospital, all as may be amended from time to time, and the Board shall retain such other authority as shall not have been specifically delegated by it to HTMS as an independent contractor pursuant to the terms of this Agreement.  The Board shall retain the full responsibility for compliance by Hospital with all applicable federal, state, and local laws, including, without limitation, compliance with federal and state laws relating to "fraud and abuse" by hospitals and other healthcare providers, including compliance with the federal Stark law of 42 U.S.C. §1395nn et. seq. The Hospital shall have, maintain, and implement through the term of this Agreement a compliance program that is consistent with the Office of Inspector General's "Model Compliance Guidelines for Hospitals."   The Board shall represent Hospital in matters pertaining to the interpretation of this Agreement; provided, that in any situation in which, pursuant to the terms hereof, the Board shall be required or permitted to take any action, to give any approval, or to receive any report, HTMS shall be entitled to rely upon the written statement of the representative or representatives of the Board who shall be designated in writing by the Board to act on its behalf under this Agreement (the "Designated Representative"), or in the absence of any such designation, the de facto Designated Representative shall be the Chair of the Board, to the effect that any such action or approval has been taken or given.  Delivery of any such report to the Designated Representative shall constitute delivery to the Board.  The Board agrees to respond promptly to requests from HTMS for direction and shall provide such decisions to HTMS in a timely fashion after receiving written request for direction.

3.2    Medical Staff; Medical and Professional Matters.  Hospital's medical staff shall be organized and shall function according to its medical staff bylaws and the laws and regulations of the State of Wyoming, as they may be amended from time to time.  HTMS shall consult with the medical staff and the Board, as may from time to time be appropriate, with respect to issues relevant to the medical staff.  All matters requiring professional medical judgment shall remain the sole

17

responsibility of Hospital's medical staff, nurses, and allied health professionals. HTMS, its employees, and contractors shall have no responsibility, control over, or liability whatsoever for such medical judgments and HTMS shall not in any way be responsible for the credentialing of any healthcare professionals on staff at the Hospital. HTMS may rely on the recommendations of the Hospital's medical staff and its designated committees and department chairmen relative to the quality of professional services provided by individuals with clinical privileges and on recommendations of the Board and the medical staff or any jointly appointed or Board appointed committee or representative as to the adequacy and proper state of repair of all medical equipment and the professional competency, training and requisite supervision of nurses, medical technicians, and other allied health professionals and medical staff.

3.3    Non-contravention. Hospital is not in breach of any contract, obligation, or covenant that would affect its ability to perform hereunder and, as a result of entering into this Agreement, will not breach any such contract, obligation, or covenant.

3.4    Notice of Tax-Exempt Funds. During the Initial Term of this Agreement or any Renewal Term thereof Hospital will not issue or be the beneficiary or recipient of any tax-exempt bond or funds without giving HTMS at least sixty (60) days' prior written notice.

3.5    Hospital Advisors. Hospital has consulted with its tax and legal advisors to ensure this Agreement does not jeopardize Hospital's tax-exempt status or the tax-exempt status of Hospital's financing, if applicable.

3.6    Hospital Responsibility for Costs. The Hospital shall be responsible for all costs and expenses incurred to operate the Hospital. Such costs shall include, without limitation the following: (a) all costs related to the employment by the Hospital of the Hospital employees; (b) all costs related to the contracting of professional services from providers, including the medical director, practicing physicians, and nurse practitioners; (c) all supplies used at the Hospital; (d) occupancy costs associated with the facilities used by the Hospital; (e) taxes incurred by the Hospital; (f) furniture, fixtures, leasehold improvements, signs and equipment used in facilities owned or operated by the Hospital; (g) insurance purchased for the Hospital; (h) attorney's fees incurred in the name

18

and on behalf of Hospital; (i) costs of advertising the Hospital's services; (j) direct costs of marketing materials for the Hospital's services; (k) costs associated with information systems developed by or for the Hospital; and (l) reimbursement of costs associated with the CEO. Costs which are the responsibility of the Hospital shall be paid from the funds of the Hospital in the Hospital's accounts and the Hospital shall at all times maintain sufficient funds in such accounts for such purposes. Nothing contained herein shall obligate HTMS to make any payments from its own funds or resources, incur any costs, or assume any liabilities either primarily or as guarantor on behalf of the Hospital, or to advance any monies to the Hospital.

ARTICLE IV
COMMUNICATIONS AND REPORTS

4.1    Monthly Reports.  HTMS shall present written monthly reports to the Board summarizing HTMS's actions and results, and such other written reports as HTMS or the Board considers appropriate to keep the Board informed as to the status and condition of Hospital, including as an example, reports concerning overall results achieved by the Hospital in terms of effective management of patient care services.

4.2    Consultation. Throughout the term of the Agreement, the Board shall cooperate with HTMS and take action with regard to any matter presented to it for approval by HTMS in a timely fashion.

4.3    Officer of HTMS.  HTMS shall provide an officer of HTMS (who shall be a vice president) who shall:

4.3.1    Be available to periodically attend meetings of the Board and also attend meetings of the medical staff upon request of the chief executive officer.

4.3.2    Provide supervision of, and coordinate support for, the CEO.

4.3.3    Evaluate the CEO's performance following input and discussion with the Board.

4.3.4    Coordinate the services of HTMS as appropriate to the needs of Hospital.

19

4.3.5  Provide consultation in preparing material for Board decisions, operational issues/problems, special projects, and leadership development.

4.3.6  Submit and present an annual accountability report to the Board of services provided by HTMS under this Agreement.

## ARTICLE V
## LICENSING, ACCREDITATION

5.1  Licensing.  Hospital has and shall maintain throughout the term of this Agreement all licenses and permits relating to the ownership and operation of Hospital, without restriction or subject to any disciplinary or corrective action.  Hospital has and shall maintain throughout the term of this Agreement all customary narcotics and controlled substances numbers and licenses.  Hospital is and shall continue to remain throughout the term of this Agreement, a participating provider in the Medicare and Medicaid programs; and Hospital is not under any governmental investigation or subject to any action that currently or might reasonably in the future be expected to result in the sanction, restriction, or expulsion of Hospital from further participation in any state or federal healthcare program.  It shall be the Hospital's responsibility to keep and maintain its establishment and operating licenses under the laws of the State of Wyoming and to ensure that all Hospital services comply with all pertinent provisions of federal, state and local statutes, rules and regulations.  Each party further covenants that it will do nothing willful or wanton to jeopardize Medicare, Medicaid and other third party reimbursement agreements.  Both Board and HTMS agree to abide by all applicable laws, ordinances, rules and regulations of state, local or federal governments pertaining to Hospital's ownership and the parties' performance of their respective duties under this Agreement.

5.2  Provider Relations.  Hospital shall conduct all of its relationships with providers, including its medical staff, in full compliance with all applicable laws.  Hospital covenants and agrees that prior to admitting a new member to the medical staff or entering into a new agreement with a contractor, Hospital will conduct appropriate credentialing of those providers, including, but not limited to, taking reasonable steps to determine whether those providers have ever been included

on the OIG's "exclusion list" of providers sanctioned or excluded from participation in a federal or state healthcare program.

## ARTICLE VI
## COMPENSATION

6.1    Base Fee. As compensation for all services rendered by HTMS under this Agreement, Hospital shall pay to HTMS a base annual management fee of ˜████████████████████ ████████████████████████████████████████████ ) annually (the "Base Annual Management Fee"). This Base Annual Management Fee is in addition to, and not in lieu of, all other payments and reimbursements to be made by Hospital to HTMS under the terms of this Agreement. Both parties acknowledge that Hospital exists for charitable purposes and to benefit the community. At no time during the Initial Term or any Renewal Term of this Agreement shall either party allow Hospital revenue or profits to take precedence over Hospital fulfilling such charitable purposes and community benefit.

6.2    Payment of Base Fee. The Base Annual Management Fee shall be paid in twelve (12) equal monthly installments throughout the term of this Agreement, commencing the month in which this Agreement becomes effective.    Each monthly payment shall be made by Hospital upon submission of a billing by HTMS upon the close of each month during which HTMS renders services.    The fee must be paid by the tenth (10th) day of the succeeding month.    Payment for any partial month shall be that proportion of the monthly installment then due which the number of days to be worked by HTMS during such partial month bears to the total number of working days in said month.

6.3    Annual Escalator. The Base Annual Management Fee provided for in Section 6.1 shall be adjusted annually on the anniversary date of each Commencement Date (as defined below) by the percentage increase or decrease in the Medical Care Component of the Consumer Price Index for "All Cities-U" for the preceding twelve (12) months.

6.4    Other Reimbursable Expenses.

21

6.4.1 Personnel Related Expenses. As provided for in Article II herein, Hospital shall be responsible for the payment of expenses incurred by HTMS relating to HTMS's personnel. Each month during the term of this Agreement, HTMS shall provide Hospital an invoice detailing such costs and expenses incurred for that month and Hospital agrees to submit payment for such costs and expenses upon receipt of the invoice.

6.4.2 Out-of-Pocket Expenses. Additionally, Hospital will be responsible for payment of the reasonable travel, lodging, meals, local transportation and out-of-pocket costs and expenses of HTMS's employees and/or consultants while performing on-site services for Hospital, not to exceed $15,000.00 annually without prior Hospital approval. HTMS shall bill such costs and expenses each month to Hospital, with such bill being due and payable by the last day of the month in which it was received.

6.5 Group Purchasing Organization Safe Harbor. Hospital acknowledges that as part of an agreement to furnish goods or services to Hospital, HTMS, acting as a group purchasing organization as defined in 42 C.F.R. §§1001.952(j) (commonly known as the "group purchasing organization safe harbor" to the Anti-Kickback law), may receive payment from the vendor thereof in connection with certain products that are purchased, licensed or leased by Hospital and, to the extent such products are billable in whole or in part to federal healthcare programs, are billed by Hospital and not by the vendor of the product, such payment to HTMS from each such vendor may not exceed three percent (3%) of the purchase price of the goods or services provided by the participating vendor. To the extent required by the group purchasing organization safe harbor, HTMS will disclose in writing to the Hospital at least annually, and to the Secretary of Health and Human Services upon request, the amount received from each vendor with respect to purchases made by or on behalf of the Hospital.

6.6 Subject to the provisions of Article VII hereof, the Base Annual Management Fee during any extension period shall be agreed to in writing and set out in amendments to this Agreement, not less than ninety (90) days prior to the first day of any extension period, or by mutual consent of the parties thereafter, but prior to the first day of any extension period. The Base Annual

22

Management Fee in any extension period shall be payable in twelve (12) equal monthly installments in the manner specified in Paragraph 6.2 above.

6.7     Incentive Program.   Hospital and HTMS agree that during the first ninety (90) days of this Agreement they will negotiate in good faith to establish an incentive compensation payment for each fiscal year within the term of this Agreement in the event HTMS surpasses measurable benchmarks agreed upon by the Board and HTMS prior to each fiscal year.  Provided the parties reach agreement the amount of such payment (which may be specified as a mathematical formula), the benchmarks to be used, and the other agreed-upon terms and conditions pertaining to such payment shall be set forth in a written document agreed to by the parties, which document will be deemed to supplement and amend this Agreement.

### ARTICLE VII
### TERM OF AGREEMENT

7.1     Subject to prior termination under Article VIII, the initial term of this Agreement shall be for five years, commencing on ~~September~~ NOVEMBER 1, 2010 MSW MD 12/20/10 TSU 1/3/2011 1, 2010 (the "Commencement Date") and terminating on ~~August 31, 2015~~ OCTOBER MSW MD 12/20/10 RSU 1/3/2011 (the "Initial Expiration Date").  Either party may cancel this Agreement without cause or penalty on ~~August 31~~ OCTOBER MSW MD 12/20/10 RSU 1/3/2011, 2013 (the "Early Cancellation Date") provided that the party provides at least ninety (90) days written notification of such cancellation to the other party.  In the event no timely cancellation notification is given, the Agreement shall continue through the Initial Expiration Date of ~~August 31~~ OCTOBER MSW MD 12/20/10 RM 1/3/2011, 2015.  This Agreement may be extended after the Initial Expiration Date for successive five (5) year terms provided that the parties have mutually agreed in writing to extend the term within ninety (90) days prior to the end of the initial term or within ninety (90) days prior to the end of any extension period.

### ARTICLE VIII
### TERMINATION

8.1     For Cause Termination.   Either party may terminate this Agreement for Cause at any time by giving written notice to the other.  Such notice shall state that the termination is for Cause and the nature of such Cause.  If the Cause is such that the defaulting party has an opportunity to cure

23

the default pursuant to Section 8.2 or 8.3 below, and the default is not cured within the applicable cure period, then the Agreement shall be terminated effective the first day after the expiration of the cure period:

    8.2    <u>For Cause Termination by the Board</u>.  Hospital shall have Cause for termination of this Agreement:

    8.2.1    if HTMS shall default in the performance of any material covenant, agreement, term, or provision of this Agreement to be kept, observed or performed by HTMS and such default shall not be cured for a period of ninety (90) days after written notice is given to HTMS by Board stating the specific default;

    8.2.2    if HTMS shall do any of the following: apply for or consent to the appointment of a receiver, trustee, or liquidator of HTMS or all or a substantial part of its assets; file a voluntary petition in bankruptcy or admit in writing its inability to pay its debts as they become due; make a general assignment for the benefit of creditors; file a petition or an answer seeking reorganization or arrangement with creditors; take advantage of any insolvency law; or, if an order, judgment or decree shall be entered by a court of competent jurisdiction, on the application of a creditor, adjudicating HTMS bankrupt or insolvent or approving a petition seeking reorganization of HTMS or appointing a receiver, trustee or liquidator of HTMS of all, or of a substantial part of its assets;

    8.2.3    if Board reasonably determines to close Hospital due to financial necessity, in which event HTMS shall be entitled to sixty (60) days' written notice and all amounts payable under this Agreement by Hospital;

    8.2.4    if HTMS should continually fail to pursue the lawful and commercially reasonable major recommendations of Hospital and not demonstrate a willingness to work cooperatively with Hospital's senior management personnel and such failure should continue for at least sixty (60) days after written notice thereof by Board shall have been given to HTMS's Chief Executive Officer.

8.3     For Cause Termination By HTMS. HTMS shall have Cause for termination of this Agreement:

8.3.1   if Hospital shall default in the performance of any material covenant, agreement term or provision of this Agreement to be kept, observed or performed by the Board or Hospital, (excluding the payment of any sum due to HTMS from Hospital) and such default shall not be cured for a period of ninety (90) days after written notice is given to Hospital by HTMS stating the specific default;

8.3.2   if Hospital shall default in the performance of its covenant to pay any fees or expenses due to HTMS, and such default shall not be cured for a period of thirty (30) days after written notice is given to Hospital by HTMS stating the specific default;

8.3.3   if, through no fault of HTMS, Hospital's Medicare or Medicaid participation is terminated or any license of Hospital necessary for Hospital to operate as an acute care hospital cannot be obtained or is at any time suspended, terminated or revoked;

8.3.4   if Hospital ceases operation as an acute health care provider;

8.3.5   if the Hospital shall apply for, or consent to, the appointment of a receiver, trustee, or liquidator of Hospital or all or a substantial part of its assets, file a voluntary petition in bankruptcy, or admit in writing its inability to pay its debts as they become due, make a general assignment for the benefit of creditors, file a petition or an answer seeking reorganization or arrangement with creditors or taking advantage of any insolvency law, or if an order, judgment or decree shall be entered by a court of competent jurisdiction, on the application of a creditor, adjudicating Hospital a bankrupt or insolvent or approving a petition seeking reorganization of Hospital, or appointing a receiver, trustee, or liquidator of Hospital, or of all or a substantial part of its assets;

8.3.6   (a) if Hospital engages in any activity that violates federal or state law or in billing or coding documentation activities that HTMS in good faith believes are improper or illegal and HTMS, in exercising its oversight functions pursuant to this Agreement, requests but

25

Hospital refuses promptly to correct or to cooperate with HTMS in correcting such activities pursuant to applicable governmental requirements; or (b) if the parties' competent healthcare regulatory or tax counsel, as applicable, jointly and reasonably believe that all or any material part of this Agreement has become illegal, voided, voidable, or otherwise unenforceable (whether by court order, legislative enactment, promulgation of rule, judicial decision, or otherwise), provided that, in such event, payment of the CEO severance pursuant to Section 2.2.3(c) shall be at Hospital's option.

ARTICLE IX
INSURANCE

9.1     Hospital's Insurance.  Hospital, at its cost, shall maintain insurance coverage during the term of this Agreement, with responsible companies.  Such coverage shall be as normally carried with respect to comparable sized hospitals, including but not limited to the following:

9.1.1     Liability Insurance.  Hospital shall maintain hospital professional and general liability insurance coverage with limits of liability of not less than $5,000,000 per occurrence and $5,000,000 annual aggregate with an insurance company approved by HTMS with either an A.M. Best's rating of –A VIII or better or at least $10,000,000 of umbrella coverage.  Such policies shall be endorsed naming HTMS and its employees as an additional insured.  During the term of this Agreement, and extending not less than five (5) years following termination of this Agreement, Hospital shall continue to provide liability insurance in these amounts covering HTMS and its employees for claims incurred during the term of this Agreement but not reported until after termination of this Agreement.  Hospital may purchase an extended reporting endorsement (tail coverage) providing extended claim reporting for a minimum of five (5) years as part of its liability insurance policy covering HTMS and its employees.  This endorsement shall provide coverage for claims incurred during the term of this Agreement but not reported until after termination of this Agreement to satisfy the five (5) year requirement of liability coverage after termination of this Agreement.

9.1.2     Directors' and Officers' Liability Coverage.  Hospital shall maintain Directors' and Officers' Liability Coverage with limits of liability of not less than $2,000,000 per

26

occurrence and $2,000,000 annual aggregate with an insurance company approved by HTMS with an A.M. Best's rating of –A VIII or better.  Such coverage shall include an endorsement to the policy providing entity and individual coverage for employment practices liability and will name HTMS and its employees as an additional insured.  During the term of this Agreement, and extending not less than five (5) years following termination of this Agreement, Hospital shall continue to provide Directors' and Officers' liability coverage including employment practices liability in these amounts covering HTMS and its employees for claims incurred during the term of this Agreement but not reported until after termination of this Agreement.  Hospital may purchase an extended reporting endorsement (tail coverage) providing extended claim reporting for a minimum of five (5) years as part of their Directors' and Officers' liability coverage.  This endorsement shall provide coverage for claims incurred during the term of this Agreement but not reported until after termination of this Agreement to satisfy the five (5) year requirement of liability coverage after termination of this Agreement.

9.1.3    Fidelity Bond.  Hospital shall maintain Fidelity insurance bond with limits of liability of not less than $200,000 per occurrence and $200,000 annual aggregate with an insurance company approved by HTMS with an A.M. Best's rating of –A VIII or better.  Policies will be endorsed naming HTMS and its employees as an additional insured.  During the term of this Agreement, and extending not less than five (5) years following termination of this Agreement, Hospital shall continue to provide a Fidelity insurance bond in these amounts covering HTMS and its employees for claims incurred during the term of this Agreement but not reported until after termination of this Agreement.

9.2    HTMS's Insurance.  HTMS, at its cost, shall maintain insurance coverage for itself and its employees during the term of this Agreement, provided, however, HTMS's insurance coverage is intended to cover and only covers HTMS, its employees and contractors.  Such insurance shall include professional and general liability insurance coverage with limits of liability of not less than $5 million per occurrence and $5million annual aggregate, and directors' and officers' liability coverage, with limits of liability of not less than $2 million per occurrence and $2 million annual

27

aggregate, with insurance companies having the same or better rating than that required of the Hospital in paragraph 9.1. HTMS's insurance does not extend to or cover Hospital, its employees, its officers, its directors or its Board. Upon Hospital's request, HTMS shall provide certificates of insurance to Hospital evidencing such policies.

9.3    All insurance policies and fidelity bonds maintained pursuant to Paragraph 9.1 above shall name HTMS as an additional named insured and shall contain an endorsement to the policy or bond stating that the policy or bond is primary insurance regardless of any other valid and/or collectible insurance. Such policies or bond shall contain an affirmative notice obligation of not less than ninety (90) days written notice to HTMS and Hospital of cancellation or non-renewal. Hospital shall provide certificates of insurance to HTMS evidencing such policies and provisions.

ARTICLE X
INDEMNIFICATION

10.1    By HTMS.  HTMS shall indemnify, defend and hold harmless Hospital and its employees, officers, and agents, from any and all expense (including but not limited to reasonable attorneys' fees and court costs), loss, liability, and claims of any kind whatsoever for damage to property or for injury to or death of any person, directly or indirectly arising from or alleged to arise from or in any way connected with the performance by HTMS of its obligations under this Agreement where such expense, loss, liability or claim is incurred by Hospital primarily as a result of (a) the grossly negligent acts or omissions of HTMS or (b) the willful and wanton misconduct of HTMS.

10.2    By Hospital.  Hospital shall indemnify, defend and hold HTMS, its officers, employees and agents harmless from and against any and all expense (including but not limited to reasonable attorney fees and court costs), loss, liability, and claims of any kind whatsoever directly or indirectly  arising from or alleged to arise from or in any way connected with the ownership or operation of the Hospital or the performance by the Board and/or  Hospital of their respective obligations under this Agreement (including but not limited to errors or omissions in the Hospital's cost reports), unless such claim is caused primarily as a result of (a) the grossly negligent acts or omissions of HTMS or (b) the willful and wanton misconduct of HTMS.

28

10.3     Limitation on HTMS's Liability. HTMS's liability to Hospital under this Agreement, including liquidated damages, shall be limited to an amount not to exceed $750,000. The limitation on HTMS's liability provided for herein shall not apply in the event HTMS is deemed to have engaged in willful and wanton misconduct in performing its obligations hereunder and shall not be applied against any amounts which are recoverable by Hospital under any valid and/or collectible insurance.

10.4     Limitation on Hospital's Liability. In the event Hospital is found to have breached its obligations under this Agreement, (except for their indemnity obligations under 10.1 and 10.2) Hospital's liability to HTMS for such breaches shall be limited to an amount equal to all management fees, salaries, fringe benefit, liquidated damages, and severance obligations due HTMS for the remaining term of this Agreement and bonuses previously earned and due HTMS.

## ARTICLE XI
## CONFIDENTIALITY OF PROTECTED HEALTH INFORMATION

11.1     Individually Identifiable Health Information. The parties shall comply with all applicable federal and state laws and regulations regarding the confidential and secure treatment of individually identifiable health information and with the terms of the Business Associate Addendum attached as Schedule 11.1 hereto and incorporated herein by reference.

## ARTICLE XII
## MISCELLANEOUS

12.1     Compliance with Laws. In performing their respective duties hereunder, HTMS and Hospital shall conduct themselves in full accordance with all applicable state, federal, and local laws and regulations, including, but not limited to, the federal physician self-referred law (commonly known as the "Stark II Law", 42 U.S.C. § 1395nn et. seq.) and the anti-fraud and abuse provisions of the Social Security Act (42 U.S.C. 1320a-7 et. seq.). Nothing in this Agreement shall require either party to arrange for or to send patients to the other party or to the other party's affiliated hospitals or providers.

29

12.2    Ownership of Information.  HTMS retains all ownership and other rights in all systems, manuals, materials, and other information, in whatever form, provided by HTMS in the performance of its obligations hereunder; and nothing contained in this Agreement shall be construed as a license or transfer of such information either during the term of this Agreement or thereafter.  Upon the termination or expiration of this Agreement, HTMS shall have the right to retain all such information, and the Hospital shall upon request deliver to HTMS all such information in its possession.

12.3    Disclaimer of Intent To Become Partners.  In performing their duties hereunder, the parties shall be and shall act as independent contractors, and neither party is or will act as a partner, agent, employee of, or in joint venture with, the other party.  Neither party will have the authority to bind the other party, contractually or otherwise, except as specifically authorized in this Agreement. The Board and HTMS specifically disclaim any fiduciary or confidential relationship, whether stated or implied by law.

12.4    Absence of Conflicts of Interest.  While this Agreement shall remain in effect, any person who serves as a member of the Board and who shall have a "conflict of interest," shall be required to disclose the same to HTMS.  For the purposes hereof, a "conflict of interest" shall be defined as any financial interest or investment, direct or indirect, in Hospital, or any department of service thereof, or as being a party to any contract or contracts for the providing of goods or services to Hospital.

12.5    Effect of Invalidity.  Should any part of this Agreement, for any reason, be declared invalid or unenforceable, such decision shall not affect the validity or enforceability of any remaining portion, which remaining portion shall remain in force and effect, as if this Agreement had been executed with the invalid portion thereof eliminated and shall be construed in such manner as may be reasonably necessary to ensure that the Agreement continues to substantially reflect the agreement of the parties.

12.6   Authorization for Agreement.  Each of the parties to this Agreement represents and warrants to the other that is has full power and authority to enter into this Agreement and to carry out the terms hereof.

12.7   Applicable Law.  The laws of Wyoming shall govern this Agreement and any dispute, claim or counterclaim arising out of or relating thereto, whether in contract or tort or otherwise, even if Wyoming's choice of law rules would require that the laws of another forum apply.

12.8   Attorney Fees.  In any dispute arising under or relating to this Agreement or the relationship established by the Agreement, if awarded by a court of competent jurisdiction or other binding decision maker appointed by the parties, such as an arbitrator, the prevailing party may recover its reasonable legal expenses.  Legal expenses may include but not be limited to reasonable attorney fees, expert witness fees, and costs.

12.9   Headings/Recitals.  The headings to the various paragraphs of this Agreement and the recitals have been inserted for convenience reference only and shall not modify, define, limit or expand the expressed provisions of this Agreement.

12.10   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute but one (1) and the same agreement.

12.11   Arbitration of Disputes.  Any disputes, claims, or counterclaims arising under or relating to this Agreement may, at the mutual agreement of the parties, be submitted to binding arbitration under the rules of conciliation and arbitration of the American Arbitration Association.

12.12   Legal Proceedings.  If HTMS is notified of a legal proceeding against Hospital, HTMS shall notify Hospital and shall coordinate legal matters and proceedings with Hospital's counsel.  With respect to actions relating to Hospital brought against both Hospital and HTMS or HTMS alone, Hospital shall, at HTMS's request, defend HTMS except that HTMS shall reimburse Hospital's legal fees in defending HTMS in those instances where HTMS is required to indemnify Hospital as provided in Article X.

31

12.13   AHA Membership.   HTMS believes that membership in the American Hospital Association ("AHA") confers significant benefits on member hospitals.  It is important to HTMS that all its managed hospitals participate as member hospitals of AHA in order to ensure that HTMS and its managed hospitals will benefit from certain group discounts, lobbying efforts, and other benefits provided by AHA.  Accordingly, during the term of this Agreement, Hospital agrees to maintain membership as a member hospital of the AHA.

ARTICLE XIII
SUCCESSORS AND ASSIGNS

13.1   Assignment.   Neither party hereto may assign its interest in or delegate the performance of its obligations under this Agreement to any other person without obtaining the prior written consent of the other party, except that HTMS may assign its interest or delegate the performance of its obligations to an Affiliated Entity or to a successor corporation to HTMS that is qualified to manage Hospital in the State of Wyoming and Hospital may assign its interest to a duly authorized successor in interest provided that any such assignee shall expressly assume in writing the obligations of Hospital to HTMS or set forth herein.  For purposes of this paragraph, an "Affiliated Entity" to HTMS shall include any entity wholly owned by HTMS or under common ownership with HTMS.

13.2   Successors and Assigns. The terms, provisions, covenants, obligations and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and the successors in interest and the assigns of the parties hereto, provided that no assignment, transfer, pledge, or mortgage by or through either party, as the case may be, in violation of the provisions of this Agreement, shall vest any rights in the assignee, transferee, pledge, or mortgagee.

ARTICLE XIV
NOTICES

14.1   Notices.   Any notice by either party to the other shall be in writing and shall be deemed to have been given the earlier of: (a) the date on which it is delivered personally or by

32

facsimile transmission or overnight delivery, or (b) four (4) days after it is deposited in the United States mail, postage pre-paid and certified with return receipt requested.

To HTMS:                 HealthTech Management Services, Inc.
                         405 Duke Drive, Suite 210
                         Franklin, TN 37067
                         ATTN: President

With copy to:            HealthTech Management Services, Inc.
                         405 Duke Drive, Suite 210
                         Franklin, TN 37067
                         ATTN:  Legal Counsel

To Hospital:             Powell Valley Healthcare, Inc.
                         777 Avenue H
                         Powell, WY  82435
                         ATTN: President, Board of Trustees

With copy to:            Copenhaver, Kath, Kitchen & Kolpitchke, LLC
                         P.O. Box 839
                         Powell, WY   82435


## ARTICLE XV
## ACCESS TO BOOKS AND RECORDS OF HTMS

15.1   Upon written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, HTMS or any other related organization providing services with a value or cost of Ten Thousand and 00/100 Dollars ($10,000.00) or more over a twelve (12) month period, shall make available to the Secretary the contracts, books, documents and records that are necessary to certify the nature and extent of the costs of providing such services.  Such inspection shall be available up to four (4) years after the rendering of such services.  This paragraph is not intended to prohibit or impede any state audits pursuant to state law or to waive any attorney-client or physician-patient privilege.  In the event the statutory amount reflected herein is revised during the term of this Agreement, this paragraph shall be deemed to be amended, without further action required by the parties hereto, to reflect said revised statutory amount.

34

## ARTICLE XVI
## NO DISCRIMINATION

16.1    Neither party shall discriminate against any person on the grounds of race, color, national origin, handicap, disability, religion or sex in the discharge of its duties and obligations herein.

## ARTICLE XVII
## ENTIRE AGREEMENT

17.1    This Agreement constitutes the sole and only agreement of the parties hereto with respect to the management of Hospital and correctly sets forth all the rights, duties and obligations of each to the other as of its date.  Any and all prior agreements, promises, proposals, negotiations or representations, whether written or oral, which are not expressly set forth in this Agreement are hereby superseded and are of no force or effect.

## ARTICLE XVIII
## AMENDMENTS

18.1    This Agreement may not be amended, modified or terminated orally, and no amendment, modification, termination or attempted waiver shall be valid unless in writing and signed by both parties.

*[Signatures follow on next page.]*

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed by their authorized representatives on the dates shown beneath their respective signatures below, provided that this Agreement is effective as of the Commencement Date set forth in Article VII of this Agreement.

HEALTHTECH MANAGEMENT SERVICES, INC.

By:

_Derek Morkel_

Derek Morkel, President and CEO

10/15/2010

Date

POWELL VALLEY HEALTHCARE, INC.

By:

_Mark S Wurzel MD_
_MARK S WURZEL, Board Chair_
(printed name and title)

10/1/10

Date

36

## Schedule 11.1

### BUSINESS ASSOCIATE ADDENDUM

This Business Associate Addendum ("Addendum") supplements and is made part of that certain Agreement for Management Services effective as of November 1, 2010 ("Agreement"), by and between Powell Valley Healthcare ("Entity") and HealthTech Management Services, Inc. ("Associate").

Entity and Associate agree that the parties incorporate this Addendum into the Agreement in order to comply with the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5) ("ARRA") and their implementing regulations set forth at 45 C.F.R. Parts 160 and 164 (the "Privacy and Security Rule"). To the extent Associate is acting as a Business Associate of Entity pursuant to the Agreement, the provisions of this Addendum shall apply and Associate shall be subject to the penalty provisions as specified by ARRA (42 USC §§ 17931(c), 17934(c)).

1. **Definitions**. Capitalized terms not otherwise defined in this Addendum shall have the meaning set forth in the Privacy and Security Rule. References to "PHI" mean Protected Health Information created or received by Associate from Entity or on Entity's behalf.

2. **Uses or Disclosures**. Associate will neither use nor disclose PHI except as permitted or required by this Addendum or as Required By Law. Associate will not sell PHI or use or disclose PHI for purposes of marketing or fundraising, as defined and proscribed in the Privacy and Security Rule and ARRA. Associate is permitted to use and disclose PHI:

   (i)    to perform any and all obligations of Associate as described in the Agreement, provided that such use or disclosure would not violate the Privacy and Security Rule, if done by Entity directly;

   (ii)   as otherwise permitted by law, provided that such use or disclosure would not violate the Privacy and Security Rule, if done by Entity directly and provided that Entity gives its prior written consent;

   (iii)  to perform Data Aggregation services relating to the health care operations of Entity;

   (iv)   to report violations of the law to federal or state authorities consistent with 45 C.F.R. § 164.502(j)(1);

   (v)    as necessary for Associate's proper management and administration and to carry out Associate's legal responsibilities (collectively "Associate's Operations"), provided that Associate may only disclose PHI for Associate's Operations if the disclosure is Required By Law or Associate obtains reasonable assurance, evidenced by a written contract, from the recipient that the recipient will: (1) hold such PHI in confidence and use or further disclose it only for the purpose for which Associate disclosed it to

the recipient or as Required By Law; and (2) notify Associate of any instance of which the recipient becomes aware in which the confidentiality of such PHI was breached;

(vi)     de-identify PHI in accordance with 45 C.F.R. § 164.514(b), provided that such de-identified information may be used and disclosed only consistent with applicable law.

In the event Entity notifies Associate of a restriction request that would restrict a use or disclosure otherwise permitted by this Addendum, Associate shall comply with the terms of the restriction request.

3.     **Information Safeguards**.  Associate will maintain appropriate administrative, technical and physical safeguards to prevent use or disclosure of PHI not permitted by this Addendum and shall maintain policies and procedures to detect, prevent, and mitigate identity theft based on PHI or information derived from PHI. Associate will also maintain administrative, technical and physical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of electronic PHI in compliance with the Privacy and Security Rule.

4.     **Subcontractors and Agents**.  Associate will require any of its subcontractors and agents, to which Associate discloses any PHI, to agree to comply with the same privacy and security obligations as Associate with respect to such PHI.

5.     **Minimum Necessary**.  Associate represents that the PHI requested, used or disclosed by Associate shall be the minimum amount necessary to carry out the purposes of the Agreement. Associate will limit its uses and disclosures of, and requests for, PHI (i) when practical, to the information making up a Limited Data Set; and (ii) in all other cases subject to the requirements of 45 CFR § 164.502(b), to the minimum amount of PHI necessary to accomplish the intended purpose of the use, disclosure or request.

6.     **Obligations of Entity**. Entity shall (i) provide Associate with a copy of the notice of privacy practices that Entity produces pursuant to 45 C.F.R. § 164.520, and Entity shall promptly furnish Associate with copies of any material changes to such notice; (ii) notify Associate of any changes in, or revocation of, permission by an individual to use or disclose PHI, if such changes affect Associate's permitted or required uses or disclosures; (iii) notify Associate of any confidential communication request or restriction to the use or disclosure of PHI affecting Associate that Entity has agreed to in accordance with 45 C.F.R. § 164.522.

7.     **Access and Amendment**.  Associate shall permit Entity or, at Entity's request, an individual (or the individual's personal representative) to inspect and obtain copies of any PHI about the individual that is in Associate's custody or control and that is maintained in a Designated Record Set. Associate will, upon receipt of notice from Entity, promptly amend or permit Entity access to amend any portion of PHI so that Entity may meet its amendment obligations under 45 C.F.R. § 164.526.

8.     **Disclosure Accounting**. Except for disclosures excluded from the accounting obligation by

the Privacy and Security Rule and regulations issued pursuant to ARRA, Associate will record for each disclosure that Associate makes of PHI the information necessary for Entity to make an accounting of disclosures pursuant to the Privacy and Security Rule. Associate will make this information available to Entity promptly upon Entity's request for the period requested, but for no longer than the six (6) years preceding Entity's request for the information (except Associate need not have any information for disclosures occurring before the effective date of this Addendum or with respect to disclosures required to be recorded by ARRA, the effective date of the ARRA regulations with respect to Entity).

9.      **Inspection of Books and Records**. Associate will make its internal practices, books, and records, relating to its use and disclosure of PHI, available upon request to Entity or the Secretary of U.S. Department of Health and Human Services ("HHS") to determine Entity's compliance with the Privacy and Security Rule.

10.     **Reporting**. To the extent known to or discovered by Associate, Associate shall promptly report to Entity any use or disclosure of PHI not permitted by this Addendum, any Security Incident involving electronic PHI, any Breach of Unsecured Protected Health Information and any Red Flag (as defined at 16 CFR § 681.2(b)) related to any individual who is the subject of PHI. Associate shall mitigate, to the extent practicable, any harmful effect known to it of a Security Incident, Breach or use or disclosure of PHI by Associate not permitted by this Addendum. Notwithstanding the foregoing, the parties acknowledge and agree that this section constitutes notice by Associate to Entity of the ongoing existence and occurrence of attempted but Unsuccessful Security Incidents (as defined below) for which no additional notice to Entity shall be required. "Unsuccessful Security Incidents" shall include, but not be limited to, pings and other broadcast attacks on Associate's firewall, port scans, unsuccessful log-on attempts, denials of service and any combination of the above, so long as no such incident results in unauthorized access, use or disclosure of electronic PHI. All reports of Breaches shall be made in compliance with 45 CFR § 164.410.

11.     **Term and Termination.**

11.1    <u>Term</u>. This Addendum shall be effective as of the effective date of the Agreement and shall remain in effect until termination of the Agreement. Either party may terminate this Addendum and the Agreement effective immediately if it determines that the other party has breached a material provision of this Addendum and failed to cure such breach within thirty (30) days of being notified by the other party of the breach. If the non-breaching party determines that cure is not possible, such party may terminate this Addendum and the Agreement effective immediately upon written notice to other party. If termination is not feasible, the non-breaching party shall report the breach to HHS.

11.2    <u>Obligations upon Termination</u>. Upon termination of this Addendum for any reason, Associate will, if feasible, return to Entity or destroy all PHI maintained by Associate in any form or medium, including all copies of such PHI. Further, Associate shall

recover any PHI in the possession of its agents and subcontractors and return to Entity or destroy all such PHI. In the event that Associate determines that returning or destroying any PHI is infeasible, Associate may maintain such PHI but shall continue to abide by the terms and conditions of this Addendum with respect to such information and shall limit its further use or disclosure of such information to those purposes that make return or destruction of the information infeasible.

11.3 <u>Survival</u>. Upon termination of this Addendum for any reason, all of Associate's obligations under this Addendum shall survive termination and remain in effect (a) until Associate has completed the return or destruction of PHI as required by Addendum Section 11.2 and (b) to the extent Associate retains any PHI pursuant to Addendum Section 11.2.

12. **General Provisions**. In the event that any law, final regulation or amendment to final regulations is promulgated by HHS or other government regulatory authority with respect to PHI or is enacted by legislative authority, the parties shall negotiate in good faith to amend this Addendum to remain in compliance with such law and/or regulations. In the absence of any such amendment, this Addendum shall be amended as a matter of law to conform to the requirements of law. Any ambiguity in this Addendum shall be resolved to permit Entity to comply with the Privacy and Security Rule. Nothing in this Addendum shall be construed to create any rights or remedies in any third parties or any agency relationship between the parties. A reference in this Addendum to a section in the Privacy and Security Rule means the section as in effect or as amended. The terms and conditions of this Addendum override and control any conflicting term or condition of the Agreement. All non-conflicting terms and conditions of the Agreement remain in full force and effect.

# EXHIBIT "B"


# HealthTech
Management Services

February 9, 2011

Mr. Paul Cardwell
1407 Indian Hills
Monticello, IN  47960

Dear Paul:

This letter is to confirm HealthTech Management Service's offer of employment to you to become Hospital CEO, full-time exempt status, for Powell Valley Healthcare in Powell, WY.  Should you accept this offer, your hire date will be on or before March 7, 2011. Your employment is contingent upon your passing the criteria for a drug screen. If your drug screen results do not meet our standards, you will be contacted immediately by us.

Your salary will be set to begin at $▓▓▓ per month (annualized ▓▓▓ per year), payable monthly. You will be eligible for your first performance and salary review 90 days following the hospital's fiscal year end, starting in 2011. Your performance and salary cycle will occur annually thereafter.

You will receive relocation assistance in accordance with our printed policy #18 in our Policy and Procedure Manual. Once we receive your moving estimates, we are prepared to cover reasonable moving costs as described in the policy.

As a full time employee, you are eligible to enroll in group benefit plans, will accrue three weeks vacation per calendar year, prorated for 2011. In addition, the hospital board at Powell Valley has offered an additional week of vacation per year, bringing your total annual vacation accrual to four weeks. Your other benefits will be as outlined in the HealthTech Policy Manual. If you choose to participate, the group insurance benefits will be effective on May 1, 2011; or the first of the month following 30 days of continuous, regular employment, provided you enroll prior to that date. You also will be eligible to participate in our 401(k) plan beginning May 1, 2011.

Please understand that your employment at is on an at-will basis and nothing in this offer letter is intended to alter the at-will status of employment.

If you wish to accept this offer, please complete and fax this signed letter today to Amy Johnson, Human Resources Generalist, at 615-309-7475. If you have any questions, you may contact Amy at 615-309-7404.

_____          __2-10-11__
Signature                                          Date

Sincerely,

Derek Morkel
Derek Morkel
President & CEO

cc:   Neil Todhunter