Bradley T. Cave, P.C. (Wyo. Bar # 5-2792)
Joanna R. Vilos (Wyo. Bar # 6-4006)
HOLLAND & HART LLP
2515 Warren Avenue, Suite 450
P.O. Box 1347
Cheyenne, WY  82003-1347
Telephone:  (307) 778-4200
Facsimile:  (307) 778-8175

Eli J. Richardson (admitted pro hac vice)
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone:  (615) 742-7825
Facsimile:  (615) 742-0416

ATTORNEYS FOR HEALTHTECH
MANAGEMENT SERVICES, INC.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| POWELL VALLEY HEALTH CARE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HEALTHTECH MANAGEMENT SERVICES, INC., | ) | Civil Action No. 12-CV-0042-F |
| | ) | |
| Defendant/Crossclaimant, | ) | **HEALTHTECH** |
| | ) | **MANAGEMENT SERVICES,** |
| v. | ) | **INC.'S BRIEF IN SUPPORT OF** |
| | ) | **MOTION FOR SUMMARY** |
| PAUL CARDWELL and MICHAEL J. PLAKE, | ) | **JUDGMENT** |
| | ) | |
| Defendants/Cross Defendants. | ) | |

Defendant/Crossclaimant HealthTech Management Services, Inc. (HealthTech) through

its counsel and pursuant to FED. R. CIV. P. 56, respectfully submits this brief in support of its

Motion for Summary Judgment.  For the reasons set forth herein, the motion should be granted

and summary judgment entered in favor of both HealthTech and Plaintiff Powell Valley Health Care, Inc. (PVHC).

## INTRODUCTION

Defendants Paul Cardwell and Michael Plake devised and carried out a scheme to defraud PVHC of $847,884 under the guise that Plake was performing physician and non-physician recruiting on PVHC's behalf through a recruiting firm called Plake & Associates. At the time they requested and accepted payment from PVHC, both Cardwell and Plake knew that no legitimate services were being performed and never would be performed by the fictitious recruiting firm. As explained more fully below, these circumstances entitle HealthTech and PVHC to summary judgment on their claims of Breach of Fiduciary Duty, Breach of the Covenant of Good Faith and Fair Dealing, Fraud/Theft and Civil Conspiracy. Accordingly, HealthTech and PVHC respectfully request judgment in their favor on all claims in the amounts substantiated below.

## SUMMARY JUDGMENT STANDARD

A Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" based on "materials in the record, including depositions, documents . . . or other materials." Fed. R. Civ. P. 56(a), (c)(1)(A).

"The party seeking summary judgment bears the initial burden of indicating the portions of the record that 'demonstrate the absence of a genuine issue of material fact.' *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). 'If the movant meets this initial burden, the burden then shifts to the nonmovant to 'set forth specific facts' from which a rational trier of fact could find for the nonmovant.' Citing "*Libertarian Party of NM v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007))." *Blakely v. USAA Casualty Ins. Co.*, No. 11-4218, 2012 U.S. App. LEXIS 21964, *10 (10th Cir. Oct. 22, 2012).

"Once the movant has made a showing that there is no genuine issue of material fact, the non-moving party 'may not rest upon the mere allegations or denials of the pleadings,' but 'must set forth specific facts showing that there is a genuine issue for trial.' To avoid summary judgment, the non-moving party must present more than a mere scintilla of evidence." *Hom v. Squire*, 81 F.3d 969, 973 (10th Cir. 1996) (citations omitted). Rather, for the nonmovant to meet its burden of showing facts indicating a genuine issue for trial, "the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party*, 506 F.3d at 1309.

As set forth below, summary judgment against both Cardwell and Plake is appropriate because HealthTech and PVHC herein meet their burden of showing an absence of any genuine issue of material fact as to both Cardwell and Plake's liability on the claims asserted against them and the amount of damages for which they are liable. As a result, the burden shifts to Cardwell and Plake to show specific facts from which a trier of fact can find in their favor as to either liability or damages issues. This they are and will remain unable to do. Accordingly, HealthTech and PVHC are entitled to judgment as a matter of law in the amounts requested.

## BACKGROUND

HealthTech provides management services to various hospitals throughout the United States, typically pursuant to an agreement for management services in effect between HealthTech and the particular client hospital. Among other management services provided to a client hospital, HealthTech in some cases identifies and provides an individual to serve at the client hospital as the Chief Executive Officer ("CEO") of that hospital. (Phillips Aff. at ¶ 2.)

The individual serving as CEO for one of HealthTech's client hospitals typically has a tripartite role. First, the individual has the powers and authority of an officer, specifically, the CEO, of the hospital. Second, the individual is a HealthTech employee for all purposes, including payroll, benefits, supervision and discipline. Third, the individual serves as

HealthTech's on-site, hospital-based agent in carrying out the CEO responsibilities under HealthTech's agreement for management services with the hospital.  (Phillips Aff. at ¶ 3.)

PVHC owns and operates a Wyoming non-profit acute-care hospital based in Powell, Wyoming, and is a longstanding client of HealthTech's pursuant to successive agreements for management services.  An Agreement for Management Services entered into as of November 1, 2010 (the Management Services Agreement) was in effect at most times relevant to HealthTech and PVHC's claims.  (See Ex. 1, Phillips Aff., at ¶ 1; Ex. A attached as "Agreement".)

Pursuant to the Management Services Agreement, HealthTech agreed, among other things, to provide PVHC with a CEO and to provide "supervision and effective management of the day-to-day business operations of [PVHC] through the CEO."  The Management Services Agreement therefore contemplated that the CEO would be HealthTech's agent for carrying out HealthTech's core responsibilities under the Management Services Agreement.

After an application process, and with the approval of PVHC, Defendant Paul Cardwell was selected by PVHC to fill the position of CEO.  Pursuant to a letter agreement signed and dated February 10, 2011 by Cardwell, Cardwell accepted HealthTech's offer to become a HealthTech employee to serve as CEO of PVHC.  (Ex. B to Phillips Aff.)

Cardwell started employment with HealthTech, serving as CEO for PVHC, on or about March 7, 2011.  Pursuant to HealthTech's job description for his position, Cardwell had "onsite CEO-level oversight responsibility for management and operation of a facility [PVHC] under a [Management Services Agreement] with HealthTech .... "  (Ex. C to Phillips Aff.)  Cardwell also was expected to demonstrate "highly ethical conduct and moral behavior in personal and professional action and communication, consistent with the goals and objectives" of HealthTech. *Id.*

By virtue of, among other things, his job description and his agent-principal relationship with HealthTech, Cardwell owed HealthTech a fiduciary duty in carrying out his duties as a HealthTech employee and as HealthTech's agent in carrying out its Management Services Agreement with PVHC.  He also owed HealthTech a duty of good faith and fair dealing.

4

In violation of these duties, shortly after arriving at PVHC to assume the role of CEO, Cardwell implemented a scheme to deceive HealthTech and PVHC, to violate the ethical and moral standards to which Cardwell agreed to adhere in his contract with HealthTech, and to defraud PVHC and improperly embezzle and misappropriate PVHC funds in the amount of $847,884.

Cardwell devised and implemented the scheme with the help and cooperation of a long-time acquaintance, Michael Plake.  As set forth below, Cardwell and Plake together carried out their plan of deception by:  (a) using Cardwell's status as PVHC's CEO to cause PVHC to make 12 payments to a purported physician recruiting firm, Plake & Associates, for services that Cardwell and Plake both knew had not been and never would be rendered; (b) representing to PVHC and HealthTech that Plake & Associates was a legitimate recruiting firm; (c) presenting PVHC and HealthTech with purported contracts with, and invoices from, Plake & Associates, knowing full well that the documents were not authentic and gave the false impression that Plake & Associates actually intended to and did engage in recruiting efforts on behalf of PVHC; and (d) secretly dividing the 12 PVHC payments between the two of them, having provided no legitimate services whatsoever to PVHC in exchange for these payments.

## STATEMENT OF FACTS

### I.      Plake's Actions

1.      On September 17, 2012, Plake pled guilty to two felony counts relating to these events — one for conspiracy to commit mail and wire fraud, the other for conspiracy to commit money laundering.  As described by the Court at Plake's guilty-plea hearing, the elements of these two counts include:  that Plake agreed with another person (Cardwell) to violate the law; that Plake knew the objective of the respective conspiracies (to commit mail and wire fraud and to commit money laundering, *i.e.*, to engage or attempt to engage in monetary transactions through, to, or with a financial institution in criminally-derived property of a value of greater than $10,000); that Plake knowingly and voluntarily participated in that agreement with

Cardwell to violate the law; and that there was interdependence among Plake and Cardwell, the members of the conspiracy.  (*See* Ex. 2, Tr. of Change of Plea Proceedings ("Plake Allocution") at 18-19, Criminal Docket Entry 48).

2.     Plake's factual admissions made when allocuting to these two felonies are, standing alone, enough to establish most of the facts necessary to support judgment for HealthTech and PVHC on their civil claims against both Plake and his co-conspirator, Cardwell. During his allocution, Plake described in his own words the scheme he and Cardwell agreed upon and implemented to fraudulently deprive PVHC of almost $850,000 over the course of six months.  This highly credible description of the crux of the criminal and tortious activity—which Plake at least is in no position to contest—when combined with certain background facts that are not genuinely disputable, establish Plake and Cardwell's liability on the theories of recovery asserted against them.

3.     In March 2011, when Cardwell became the CEO of PVHC, Plake and Cardwell discussed and agreed to carry out a scheme by which Plake would pretend to operate a physician recruiting firm and would offer fictitious recruiting services in exchange for payment.  (Plake Allocution at 20-21.)  Based on Cardwell's misrepresentations to PVHC about the services to be provided by Plake & Associates, Plake received 12 checks from PVHC during the period of April to September 2011.  (Plake Allocution at 20.)  The 12 checks totaled $847,884.  (Taylor Decl. at ¶ 37.)

4.     In developing their scheme, Plake and Cardwell agreed that Plake would retain 25% of the amounts PVHC paid to Plake & Associates and Cardwell would receive the other 75%.  (Plake Allocution at 21.)  As Plake explained, "I would deposit my checks into my business, Plake & Associates, which I was the dba of.  For the first portion of the Powell Valley from March through about August, I would then mail checks back to [Cardwell], you know, in the amounts that we agreed upon.  Starting in August, [Cardwell] wanted the checks – he wanted his portion wired to banks in Thailand, which I then did."  (Plake Allocution at 22.)

5.     Plake understood that "the funds that were being paid to [Plake] were coming from the hospital on the representations that [Plake] was doing the recruiting…"  (Plake Allocution at 24).  Plake, however, admits he did absolutely no recruiting for PVHC in exchange for the payments he received.  (Plake Allocution at 27.)

6.     In August 2011, after receiving several payments from PVHC, Plake received a call from PVHC's Chief Financial Officer ("CFO"), Calvin Carey, inquiring about recruiting agreements for the services Plake & Associates was purportedly providing.  Then, in September 2011, Plake received phone calls from the General Counsel of HealthTech, Brenda Phillips, also inquiring about the purported recruiting services.  (Plake Allocution at 22-23.)  More specifically, after HealthTech became suspicious about the payments to Plake & Associates, called Plake on September 23 at a number for him she had found on the Internet, and left a voice message.  (Phillips Aff. at ¶ 8.)  Plake called her back, whereupon they spoke briefly, enough for Plake to confirm that he was the Michael Plake with Plake & Associates.  (*Id*.)

7.     The next day, September 24, Phillips and Plake spoke again telephonically.  Phillips asked him questions about Plake & Associates, including asking why the Indiana Secretary of State had no record of it. In response, Plake told Phillips that Plake & Associates was formed in Iowa in 2003, but that he was not sure it was properly set up in Indiana or Iowa.  He falsely represented to her that Plake & Associates was a bona fide physician recruiting company and told her that in prior years he had recruited only six to seven physicians per year but that during 2011 his business had "exploded."  Plake stated that he did not like "retained searches" because he had to give back the fee if he did not find a candidate and at all times during the conversation he held himself out to be the person doing the purported recruiting.  Plake falsely told Phillips that Plake & Associates had physician recruiting agreements in place with PVHC.  Moreover, at no time did he state or otherwise indicate to Phillips anything consistent with the impression he later attempted to convey, at his guilty plea allocution, that his role was only to provide some kind of administrative or accounting function for the business or that Cardwell was the person providing the purported recruiting services. Rather, Plake held

7

himself out to be the person providing physician recruiting services—which he portrayed as legitimate—through his company Plake & Associates. (*Id*.)

8.      During Phillips' conversation with Plake on September 24, and in a follow up email, Phillips asked to see a copy of at least one of the agreements he said were in place between PVHC and Plake & Associates. The next day, rather than admit that in fact there were no such agreements, Plake continued his attempt to create the false appearance that Plake & Associates had been doing legitimate recruiting; specifically, Plake emailed her a mere (uncompleted) template agreement, not completed agreements as she had requested. (*Id*. at ¶ 9; *Id*., Exs. D and D1.)

9.      After these contacts from PVHC and HealthTech, Plake and Cardwell "concocted recruiting agreements and dated them at dates that would coincide with, you know, when the fictitious recruiting activities were going to occur. I also – I sent via e-mail – I sent all of this via email. I sent the recruiting agreements and invoices. I sent invoices for all of these based on the checks that I had received and sent all of that via e-mail through a PDF file to the CFO." (Plake Allocution at 23; *see also* Taylor Decl. at ¶ 36.) On September 25, 2011, PVHC received an email from Plake attaching the bogus recruiting contracts and invoices and purporting to provide an update on the recruiting efforts. (Taylor Decl. at ¶ 36.) Three days later, on September 28, 2011, Plake registered "Plake & Associates, LLC" with the Indiana Secretary of State. *(See* Ex. 4, Cert. of Organization). By that time, Plake & Associates had received almost $850,000 in payments from PVHC for recruiting services that never occurred.

## II.      Cardwell's Actions

1.      Cardwell—clothed with the status of CEO, and with full knowledge that Plake & Associates was a fictitious recruiting firm designed to embezzle money—initiated all of the payments from PVHC to Plake & Associates. From the beginning, in his communications with PVHC personnel (including the emails cited below), Cardwell gave the impression that Plake & Associates was a legitimate business providing physician-recruiting services and physician-

compensation surveys, with whom Cardwell had a professional, arms-length relationship on behalf of one or more prior employers and then PVHC.  Exs. 5-10. However, as Cardwell clearly wished to conceal, Plake in fact was a longstanding friend of Cardwell's dating all the way back to high school.  Deposition of Barbara Cardwell, at 40-41.  In some of the emails cited herein, Cardwell also falsely characterized Plake & Associates as based in Iowa—where, as noted below, Plake later told HealthTech's General Counsel he formed Plake & Associates approximately a decade ago (Phillips Aff. ¶ 8.)—perhaps in an attempt to disguise the fact that Plake actually was Cardwell's friend from Indiana.

10.     According to a federal indictment filed against Plake and Cardwell in Indiana (N.D. Ind. Case No. 2:12-cr-00161) and transferred to this Court pursuant to Fed. R. Crim. P. 20, the two men together had defrauded White County Memorial Hospital in Monticello, Indiana pursuant to a conspiracy lasting from approximately March 2003 through October 2009 in a similar scheme involving non-existent but alleged recruiting services performed by Plake & Associates.

11.     Cardwell began to lay the groundwork for a different joint scheme—this one to defraud PVHC—no later than March 15, 2011, just days after Cardwell arrived at PVHC. On that date, Cardwell emailed PVHC's Vice President for Physician Services, suggesting that for physician-recruiting, PVHC retain "an Iowa based firm" Cardwell had worked with for the last five years and which had "successfully recruited 23 physicians to White County Memorial Hospital."  (Ex. 5.)   Likewise, sometime shortly after arriving at PVHC, Cardwell notified the accounting department that he had engaged a firm called Plake & Associates to provide recruiting services to PVHC.  (Taylor Decl. at ¶ 3.)  He told the accounting department he had worked with Plake & Associates in the past and the firm had always done an excellent job of sending him candidates.  (Taylor Decl. at ¶ 35.)

12.     The genesis of Cardwell and Plake's conspiracy to defraud PVHC occurred a few days later, on March 21, 2011.  On that date, Cardwell contacted Plake to "chat" and request the

address and federal tax ID number for Plake & Associates—manifestly in preparation for bilking PVHC.  (Ex. 11.)

13.     Sometime in late March 2011, PVHC's Payables Clerk told Cardwell she needed a completed IRS Form W-9 from Plake & Associates before she could release any payments to it.  (Taylor Decl. at ¶ 3.)  Soon after that, Taylor received a completed W-9 from Cardwell for "Michael J. Plake, Plake & Associates LLC."  (Taylor Decl. at ¶ 5.)

14.     In reliance upon the direction and authorization of Cardwell as the CEO of PVHC, and with the belief that Cardwell had in fact obtained PVHC's Board's approval, as Cardwell claimed to have done, PVHC's accounting department began issuing a series of 12 payments to Plake & Associates.  (Taylor Decl. at ¶ 36.)  During the period of April 2011 to September 2011, these 12 payments were requested by Cardwell and issued by the PVHC accounting department as follows:

- On or about April 4, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $57,200 payable to Plake & Associates, purportedly for "physician recruitment x 2."  (Taylor Decl. at ¶ 6.)

- Based on the April 4, 2011 authorization from Cardwell, on April 7, 2011, the PVHC accounting department issued check number 122761, made payable to Plake & Associates, LLC in the amount of $57,200.  (Taylor Decl. at ¶ 7.)

- On or about May 9, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $72,643 payable to Plake & Associates, purportedly for "physician recruitment."  (Taylor Decl. at ¶ 8.)

- Based on the May 9, 2011 authorization from Cardwell, on June 11, 2011, the PVHC accounting department issued check number 123510, made payable to Plake & Associates, LLC in the amount of $72,643.  (Taylor Decl. at ¶ 11.)

- On or about June 15, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $30,254 payable to Plake & Associates for recruiting services.  (Taylor Decl. at ¶ 12.)

- Based on the June 15, 2011 authorization from Cardwell, on June 18, 2011, the PVHC accounting department issued check number 124349, made payable to Plake & Associates, LLC in the amount of $30,254.  (Taylor Decl. at ¶ 13.)

- On or about June 20, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $33,500 payable to Plake & Associates for recruiting services.  (Taylor Decl. at ¶ 14.)

- Based on the June 20, 2011 authorization from Cardwell, on June 23, 2011, the PVHC accounting department issued check number 124522, made payable to Plake & Associates, LLC in the amount of $33,500.  (Taylor Decl. at ¶ 15.)

- On or about June 28, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $96,150 payable to Plake & Associates for recruiting services.  (Taylor Decl. at ¶ 16.)

- Based on the June 28, 2011 authorization from Cardwell, on June 30, 2011, the PVHC accounting department issued check number 124588, made payable to Plake & Associates, LLC in the amount of $96,150.  (Taylor Decl. at ¶ 17.)

- On or about July 14, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $90,675 payable to Plake & Associates for recruiting services.  (Taylor Decl. at ¶ 18.)

- Based on the July 14, 2011 authorization from Cardwell, on July 14, 2011, the PVHC accounting department issued check number 124946, made payable to Plake & Associates, LLC in the amount of $90,675.  (Taylor Decl. at ¶ 19.)

- On or about July 20, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $57,500 payable to Plake & Associates for recruiting services.  (Taylor Decl. at ¶ 20.)

- Based on the July 20, 2011 authorization from Cardwell, on July 20, 2011, the PVHC accounting department issued check number 124991, made payable to Plake & Associates, LLC in the amount of $57,500.  (Taylor Decl. at ¶ 21.)

- On or about July 26, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $72,825 payable to Plake & Associates for recruiting services.  (Taylor Decl. at ¶ 22.)

- Based on the July 26, 2011 authorization from Cardwell, on July 28, 2011, the PVHC accounting department issued check number 125186, made payable to Plake & Associates, LLC in the amount of $72,825.  (Taylor Decl. at ¶ 23.)

- On or about August 17, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $83,185 payable to Plake & Associates for recruiting services.  (Taylor Decl. at ¶ 24.)

- Based on the August 17, 2011 authorization from Cardwell, on August 17, 2011, the PVHC accounting department issued check number 125547, made payable to Plake & Associates, LLC in the amount of $83,185.  (Taylor Decl. at ¶ 25.)

- On or about September 7, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $79,425 payable to Plake & Associates for recruiting services.  (Taylor Decl. at ¶ 29.)

- Based on the September 7, 2011 authorization from Cardwell, on September 8, 2011, the PVHC accounting department issued check number 126245, made payable to Plake & Associates, LLC in the amount of $79,425.  (Taylor Decl. at ¶ 30.)

- On or about September 12, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $83,889 payable to Plake & Associates for recruiting services.  (Taylor Decl. at ¶ 31.)
- Based on the September 12, 2011 authorization from Cardwell, on September 13, 2011, the PVHC accounting department issued check number 126293, made payable to Plake & Associates, LLC in the amount of $83,889.  (Taylor Decl. at ¶ 32.)

- On or about September 19, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $90,638 payable to Plake & Associates for recruiting services.  (Taylor Decl. at ¶ 33.)
- Based on the September 19, 2011 authorization from Cardwell, on September 20, 2011, the PVHC accounting department issued check number 126434, made payable to Plake & Associates, LLC in the amount of $90,638.  (Taylor Decl. at ¶ 34.)

15.     In carrying out the deception, Cardwell personally authored emails regarding purported, but in fact non-existent, recruiting efforts and then made the emails appear to have been written and sent by Plake.  (*See* Exs. K, M, O, S, BB, DD to Taylor Decl.)  Printouts, often but not always signed by Cardwell, of emails purportedly written and sent by Plake, in most cases constituted the sole documentation Cardwell used to justify payment to Plake. (*See* Taylor Decl. ¶¶ 14-19, 22-23, 31-34.)  Cardwell's method of creating emails that appeared to come from Plake typically (with the notable exception of the email created by Cardwell on August 30, 2011, referenced below) consisted of Cardwell first drafting an email and sending it to himself. (Phillips Aff. at ¶ 19.)  Then, in all likelihood, in his email program he chose the option to forward the email he had received from himself, which would then enable him to electronically edit (by simply using his keyboard) the name of the original sender of that email before actually forwarding it, *i.e.*, before clicking the "send" option to send the email to the forwarding email address. Thus enabled, Cardwell would change the name of the sender of the original email from Cardwell to "Mike Plake" – a giveaway that it was actually not Plake who was the original

13

sender, because Plake disliked being called "Mike" and would not have chosen to identify himself by that name.  (Phillips Aff. at ¶ 20 .) Then, Cardwell would click the "send" button to forward the email, which now appeared to have come originally from "Mike Plake," to the forwarding email addressee he had chosen – himself. Once he received this forwarded email, Cardwell could print out the email and present it as support and justification for issuance of a payment to Plake & Associates. (Phillips Aff. at ¶ 21.)

  16. One example of Cardwell's use of this method comes from June 20, 2011. On that date, Cardwell sent an email to himself (Ex. 12) time-stamped 5:43 p.m. with a copy to an email address, "mplake@p&a.com," made to appear associated with Plake & Associates although in fact the address is nonexistent (inasmuch as the "&" symbol cannot appear in a legitimate email domain name, *see* Phillips Aff. at ¶ 23.)  The content of the email is in the form of a message from Plake to Cardwell acknowledging Cardwell's request to have Plake add allied health providers and nurse managers to PVHC's recruitment portfolio.  In addition, "Plake" suggests in the email that Plake's wife, Kim Plake, is involved in the business and sends direct mailers on Plake & Associates' behalf.  However, in fact Kim Plake has never done any recruiting for Plake & Associates.  (Phillips Aff. at ¶ 24.)  "Plake" also quotes $16,000 for a Medical-Surgical search and $17,500 for a Surgical-OR Director search. The exact same email (except that the time stamp is exactly one hour earlier, likely simply a common reflection of the time zone difference—here, one hour's difference—between the sending email system and the receiving email system), though purporting to be from "Mike Plake" instead of Cardwell, is forwarded from Cardwell to Cardwell at 5:45 p.m.  (Ex. 13.)  On a printout of the email, as forwarded from Cardwell to himself, Cardwell handwrote a total of $33,500 for "OR Search" and "MS Search" and signed his name along with "authorized 6-20-11." (Taylor Decl. at ¶ 14; Ex. K to Taylor Decl.)  Cardwell then presented this email to authorize payment to Plake, resulting in issuance of a check to Plake & Associates for $33,500.  (Taylor Decl. at ¶ 15.)

17.     A similar example comes from July 14, 2011.[1] Cardwell sent himself an email (copying the non-existent email address mplake@p&a.com) time-stamped 11:42 a.m. that day, which (for whatever reason) contained no message but merely forwarded a message from Danette Koehler to Cardwell.  (Ex. 14.)  The same email, though now purporting to be from Plake to Cardwell, was forwarded from Cardwell to himself at 12:01 that day.  The forwarding (rather than forwarded) email contained a purported message from Plake to Cardwell, wherein "Plake" provides quotes for four searches totaling $90,675 for two "specialty" RNs, an oncologist and a urologist.  (Ex. 15.)  On a copy of the forwarding email, Cardwell handwrote "$90,675, Board authorized search, 7/13/11," signed his name, and dated it 7/14/11. (Taylor Decl. at ¶ 18; Ex. O to Taylor Decl.)  Cardwell then presented this email to authorize payment to Plake, resulting in issuance of a check to Plake & Associates for $90,675.  (Taylor Decl. at ¶ 19.)

18.     Notably, Plake was aware that Cardwell wrote and handled emails to appear as if they came from Plake. There is at least one documented instance of Plake receiving the text for an email purporting to be from Plake but actually drafted by Cardwell, and then emailing the text back to Cardwell under Plake's name.  In particular, on August 30, 2012, Cardwell emailed his (Cardwell's) mother, who is the person using the email moniker, "Birdwell" (*see* Phillips Aff. at ¶ 23); Cardwell's email contained substantive content for an email ostensibly to him from Plake regarding recruiting efforts, and Cardwell requested that his mother send the content to Plake at mjplake@gmail.com, which she did.  (Ex. 16.)  Although she did so, she was clearly confused by the request.  (Ex. 17.)  On September 12, 2011, Plake emailed Cardwell's mother to acknowledge the receipt of her email containing this substantive content (and also to catch up

_____

[1] This example is a little different, because in this case, as noted above, Cardwell inexplicably (and probably mistakenly) put the purported text from Plake in the wrong place. Cardwell did not put it where it should have gone – where it should have gone is the 10:42 email purportedly from Plake to Cardwell (but which in fact was from Cardwell to himself).  Rather, he put it in the forwarding message from Cardwell to himself, which should have contained only Cardwell's words, not Plake's. In this manner, as well as other ways referenced herein, Cardwell gave away the fact that these emails were created by himself rather than by Plake as purported.

with someone who clearly was like an old friend to him).  (Ex. 18.)  Later that day, Cardwell's mother emailed Cardwell to ask whether Cardwell made a mistake in having her forward it to Plake; Cardwell responded somewhat unintelligibly but pretending like he had indeed made some sort of mistake.  (*Id*.)  In fact, back on August 30, Plake had sent Cardwell, from Plake's own actual email address (mjplake@gmail.com) an email containing the same substantive content Cardwell had had his mother email to Plake.  (Ex. 19.)

19.     In all, the payments authorized by Cardwell and paid by PVHC to Plake & Associates totaled $847,884 – 75% of which was ultimately provided to Cardwell by Plake in accordance with their agreement.  (Plake Allocation at 11.)

20.     During the course of receiving the payment requests from Cardwell, PVHC's accounting department asked Cardwell to provide "receipts" from Plake & Associates for the payments.  (*See, e.g.,* Taylor Decl. at ¶¶ 9-10.)  On several occasions, the accounting department also asked Cardwell to provide recruiting contracts and invoices from Plake & Associates. Cardwell responded that Plake had prepared contracts and invoices for all of the recruiting services and would be "resending" those documents soon.  (Taylor Decl. at ¶ 35.)  The requested documents finally arrived on September 25, 2011, after Plake and Cardwell "concocted recruiting agreements and dated them at dates that would coincide with … when the fictitious recruiting activities were going to occur."  (Plake Allocation at 23; Taylor Decl. at ¶ 36.)

21.     In the meantime, as PVHC's auditors and others were becoming increasingly suspicious of the large payments to Plake & Associates and the lack of documentation to support them, Cardwell resigned from his position as the CEO of PVHC on or about September 23, 2011.  Two days later, however, on September 25, Cardwell sent an email to HealthTech attempting to revoke his resignation.  In the email, Cardwell noted that Plake had provided the requested contracts and invoices and stated "[h]opefully it is obvious with the support documents enclosed that all is well … I have done nothing wrong, just the opposite, and am preparing a vigorous defense."  (Ex. 20.)  HealthTech and PVHC did not permit Cardwell to rescind his resignation.

22.     During the course of Cardwell's status as a HealthTech employee serving as PVHC's CEO, HealthTech upheld its obligation under the employment agreement to pay Cardwell his agreed-upon salary for the period of March 2011 to September 2011.  (Phillips Aff. at ¶ 7.)  PVHC, for its part, reimbursed HealthTech for Cardwell's services by paying HealthTech an amount equivalent to Cardwell's salary plus an additional 30% of Cardwell's salary to cover his benefits administration.  In all, PVHC made payments to HealthTech totaling $143,944.83 as reimbursement for Cardwell's salary and benefits administration.  (Taylor Decl. at ¶¶ 39-40.)

## ARGUMENT

### I.     Breach of the Covenant of Good Faith and Fair Dealing

In Counts Two and Three of the Complaint as originally filed by HealthTech, HealthTech asserted claims for breach of the implied covenant of good faith and fair dealing sounding in contract and tort, respectively.  Every contract contains an implied covenant of good faith and fair dealing that requires (1) "neither party to a commercial contract act in a manner that would injure the rights of the other party to receive the benefit of the agreement"; and (2) "the parties to act in accordance with their agreed common purpose and each other's justified expectations." *Universal Drilling Co., LLC v. R & R Rig Serv., LLC*, 2012 WY 31, ¶¶ 38, 40, 217 P.3d 987, 999 (Wyo. 2012).  "The injured party must demonstrate the other party acted in 'bad faith' by violating community standards of decency, fairness or reasonableness." *Id.* at ¶ 40.

In exchange for the salary and benefits to be provided under his at-will employment agreement with HealthTech, Cardwell agreed to adhere to high ethical, moral, and professional standards in carrying out his duties as CEO of PVHC.  As described in detail above, Cardwell breached the agreement by defrauding PVHC of $847,884 and acting contrary to the interests of both HealthTech and PVHC.  Needless to say, Cardwell's theft did not comport with the agreed-upon common purpose of the employment contract, the justified expectations of HealthTech, or community standards of decency, fairness or reasonableness.  By embezzling PVHC's funds and

deceiving HealthTech, Cardwell deprived HealthTech of the benefit of its agreement and breached the duty of good faith and fair dealing.

## II.     Breach of Fiduciary Duty

In Count One of the Complaint as originally filed by HealthTech, HealthTech asserted a claim for breach of fiduciary duty.[2] The Wyoming Supreme Court defines a fiduciary as "a person having duty, created by his own undertaking, to act primarily for another's benefit in matters connected with such undertaking." *Martinez v. Assoc. Fin. Serv. Co. of Colo., Inc.*, 891 P.2d 785, 789-90 (Wyo. 1995). "[A]n agent acts in a fiduciary capacity and owes to the principal the utmost good faith." *Snearly v. Hockett*, 352 P.2d 230, 233-234 (Wyo. 1960). As HealthTech's agent for carrying out its duties under the Management Services Agreement with PVHC, Cardwell owed a fiduciary duty to HealthTech. Based on the conduct outlined above, including making false representations to both PVHC and HealthTech and misappropriating PVHC's funds for his own use, Cardwell breached this duty. During the course of Cardwell's employment, he received $143,944 in compensation and benefits, all of which should be returned to HealthTech due to Cardwell's misconduct and breach of his duties. *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT §43 (2011) (person who obtains benefit in breach of fiduciary duty is liable in restitution to person to whom duty is owed).

---

[2] HealthTech's claim for breach of the implied covenant of good faith and fair dealing sounding in tort is encompassed in the discussion of breach of fiduciary duty. The tort theory requires "a special relationship of trust and reliance exists between the employer and employee." *See Springer v. Blue Cross & Blue Shield*, 944 P.2d 1173, 1178 (Wyo. 1997). In this case, the special relationship arises from Cardwell's role as HealthTech's agent in carrying out its obligations under the Management Services Agreement. Through the acts described above, Cardwell committed a tortious breach of the implied covenant as well as a breach of the fiduciary duty.

### III.    Fraud

In Count One of the cross-claim filed by PVHC, PVHC asserted a claim for fraud.[3] To demonstrate fraud, a plaintiff must show: (1) the defendant made a false representation intended to induce action by the plaintiff; (2) the plaintiff reasonably believed the representation to be true; and (3) the plaintiff relied on the false representation and suffered damages. *Excel Constr., Inc. v. HKM Eng'g, Inc.*, 2010 WY 34, ¶ 33, 228 P.3d 40, 48 (Wyo. 2010).

The actions of Plake and Cardwell present a classic case of fraud.  Knowing it was false, Cardwell told PVHC board members and employees that Plake & Associates was a reputable recruiting firm and was actively performing recruiting services on PVHC's behalf.  Under these false pretenses, Cardwell requested and authorized PVHC's accounting department to make payments to Plake & Associates.  PVHC's accounting department justifiably relied on these representations from Cardwell, believing that Plake & Associates was in fact performing legitimate recruiting services and that Cardwell had obtained all necessary approval to authorize the payments.  As a result of Cardwell and Plake's successful deception, PVHC issued payments totaling $847,884 for recruiting services that Cardwell and Plake knew had not occurred and were not going to occur.

Each time Plake received a check from PVHC, he endorsed it and accepted payment, knowing the check had been issued based on PVHC's understanding that Plake was performing recruiting services.  (Plake Allocution 21-22).  Over the course of six months, Plake accepted and endorsed 12 checks—each time representing to PVHC that Plake was in fact carrying out the recruiting activities on which the payments were premised.  Further perpetuating the fraud, Plake told Brenda Phillips, HealthTech's General Counsel, that Plake & Associates was a legitimate recruiting firm and Plake was personally recruiting on PVHC's behalf.  (Phillips Aff. at ¶ 8.)  In

---

[3] In Count Two, PVHC likewise asserted a claim for intentional misrepresentation, which appears to be essentially the same as a claim for fraud. To avoid redundancy, the discussion here will be in terms of a claim for fraud.

addition, Plake sent falsified invoices and recruiting contracts to PVHC in an effort to persuade PVHC that legitimate recruiting services had been performed and were still ongoing.  (Taylor Decl. 35-36.)  These actions constitute fraud.  *See, e.g., Sundown, Inc. v. Pearson Real Estate Co., Inc.*, 8 P.3d 324, 330-31 (Wyo. 2000) (conduct or words tending to produce an erroneous impression may satisfy a plaintiff's burden to prove fraud).

### A.    Conversion

These acts by Cardwell and Plake also constitute conversion or civil theft, as alleged in Count One of PVHC's cross-claim for fraud/theft.  Conversion occurs when a person treats another's property as his own, and denies the true owner the benefits and rights of ownership.  *Johnson v. Reiger*, 2004 WY 83, ¶ 27, 93 P.3d 992, 999-1000 (Wyo. 2004).

The funds used to make payments to Plake & Associates belonged to PVHC.  Cardwell and Plake had no rightful entitlement to those funds but instead obtained the money through acts of fraud.  Based on Cardwell and Plake's misrepresentations that Plake & Associates was a bona fide physician recruiting company, PVHC made payments to Plake & Associates in excess of $847,000 for recruiting services that were never delivered.  (Plake Allocution at 27.)  These acts by Cardwell and Plake deprived PVHC of the opportunity to recruit physicians or put its money to other uses.  PVHC received nothing of value in exchange for the $847,884 it paid to Plake & Associates and thus suffered damage as a result.

### IV.    Punitive Damages

Cardwell and Plake acted willfully, maliciously, intentionally, fraudulently, in bad faith, and in knowing and reckless disregard of HealthTech and PVHC's rights in taking PVHC's funds.  Based on this conduct, Cardwell and Plake are liable for punitive damages.  *See Alexander v. Meduna*, 2002 WY 83, ¶ 41, 47 P.3d 206, 218 (Wyo. 2002) ("Outrageous conduct, malice, and willful and wanton misconduct are sufficient bases to warrant punitive damages.").

### V.      Civil Conspiracy and Damages

As laid out fully above, Cardwell and Plake combined with one another to pursue the mutual object of improperly obtaining PVHC's money through the operation of a fictitious recruiting firm.  As demonstrated by Plake's admissions in the criminal case, Cardwell and Plake shared a meeting of the minds on this object and course of action.  (Plake Allocution at pp. 18-19.)  In addition, Cardwell and Plake each committed several unlawful, overt acts directed at fulfilling their common object and course of action.  They also actively engaged in efforts to conceal the existence of their conspiracy and wrongful conduct from HealthTech and PVHC.

HealthTech and PVHC have suffered damages (including but not limited to $847,884 in fictitious recruiting expenses; $143,944.83 for Cardwell's salary and benefits; investigation costs; coverage costs; litigation costs; and settlement costs) as a direct and proximate result of Cardwell and Plake's civil conspiracy.  Accordingly, Cardwell and Plake, as co-conspirators, are jointly and severally liable with one another for all damages awardable on each of the causes of action pled against each of them.  *See White v. Shane Edeburn Constr., LLC*, 2012 WY 118, ¶ 29, 285 P.3d 949, 958 (Wyo. 2012).  Specifically, Cardwell and Plake should be held jointly and severally liable for the following damages:

- $847,884 for payments from PVHC to Plake & Associates;
- $143,944.83 for Cardwell's salary and benefits;
- Punitive damages in an amount to be determined;
- PVHC's attorneys' fees incurred in prosecuting the fraud committed by Cardwell and Plake, in an amount to be presented through a post-judgment application for fees and determined to be reasonable by the Court (*see Alexander v. Meduna*, 2002 WY 83, ¶ 49, 47 P.3d 206, 220-21 (Wyo. 2002) (attorney fees and costs may be awarded where fraud warranting punitive damages is shown);

- HealthTech's investigation and coverage costs, in an amount to be presented through a post-judgment application and determined to be reasonable by the Court;

- HealthTech's attorneys fees incurred in protecting its interests and in defending against claims arising from the tortious actions of Cardwell and Plake, in an amount to be presented through a post-judgment application for fees and determined to be reasonable by the Court (*see, e.g., Sundown, Inc. v. Pearson Real Estate Co., Inc.*, 8 P.3d 324, 333 (Wyo. 2000) (addressing recovery of attorney fees under "tort of another" doctrine)); and

- Amounts paid by HealthTech to settle the claims brought against it by PVHC.

## CONCLUSION

For the reasons set forth above, Defendant/Crossclaimant HealthTech Management Services, Inc. and Plaintiff Powell Valley Healthcare, Inc. respectfully request summary judgment in their favor on all claims asserted against Defendants Paul Cardwell and Michael Plake.

DATED:  April 29, 2013.

/s/ Joanna R. Vilos
Bradley T. Cave P.C. (Wyo. Bar # 5-2792)
Joanna R. Vilos (Wyo. Bar # 6-4006)
2515 Warren Avenue, Suite 450
P.O. Box 1347
Cheyenne, WY  82003-1347
Telephone:  (307) 778-4200
Facsimile:  (307) 778-8175
bcave@hollandhart.com
jvilos@hollandhart.com

Eli J. Richardson (*admitted pro hac vice*)
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone:  (615) 742-7825
Facsimile:  (615) 742-0416
richardsonej@bassberry.com

ATTORNEYS FOR CROSS-PLAINTIFF
HEALTHTECH MANAGEMENT SERVICES, INC.

### CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2013, I served a true and correct copy of the foregoing by CM/ECF addressed to the following:

Robert W. Horn
ROBERT W. HORN, P.C.
230 East Broadway, Suite 3A
P.O. Box 4199
Jackson Hole, WY 83001
rhornatty@me.com

Robert W. York
ROBERT W. YORK & ASSOCIATES
7212 North Shadeland Avenue, Suite 150
Indianapolis, IN 46250
rwyork@york-law.com

Tracy J. Copenhaver
COPENHAVER, KATH, KITCHEN & KOLPITCKE, LLC
P.O. Box 839
Powell, WY 82435
tracy@ckattorneys.net

Michael Reese
MICHAEL REESE, LLC
The Colony Building
211 West 19th Street, Suite 400
Cheyenne, WY  82001
mike@mhrwylaw.com

/s/ Joanna R. Vilos