# Exhibit 1
# Affidavit of Brenda Phillips

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| POWELL VALLEY HEALTH CARE, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> HEALTHTECH MANAGEMENT SERVICES, INC., ) <br> ) <br> Defendant/Crossclaimant, ) <br> ) <br> v. ) <br> ) <br> PAUL CARDWELL and MICHAEL J. PLAKE, ) <br> ) <br> Defendants/Cross Defendants. ) <br> ) | Civil Action No. 12-CV-0042-F <br><br> **AFFIDAVIT OF BRENDA PHILLIPS** |

Brenda Phillips swears and affirms as follows:

1. I am the General Counsel of HealthTech Management Services, Inc. ("HealthTech"). I have personal knowledge of the matters stated in this Affidavit, and I am otherwise competent to testify regarding these matters.

2. HealthTech provides management services and consulting services to various hospitals throughout the United States, typically pursuant to an agreement for management services in effect between HealthTech and the particular client hospital. Among other management services provided to a client hospital, HealthTech in some cases identifies and provides an individual to serve at the client hospital as the Chief Executive Officer ("CEO") of that hospital.

3. The individual serving as CEO for one of HealthTech's client hospitals typically has a tripartite role. First, the individual has the powers and authority of an officer, specifically, the CEO, of the hospital. Second, the individual is a HealthTech employee for all purposes, including payroll, benefits, supervision and discipline. Third, the individual serves as HealthTech's on-site, hospital-based agent in carrying out the CEO responsibilities under HealthTech's agreement for management services with the hospital.

4. Plaintiff Powell Valley Healthcare, Inc. ("PVHC") owns and operates a Wyoming non-profit acute-care hospital based in Powell, Wyoming, and is a longstanding client of HealthTech pursuant to successive agreements for management services. An Agreement for Management Services entered into as of November 1, 2010 (the Management Services Agreement) was in effect at most times relevant to HealthTech and PVHC's claims.

5. Pursuant to the Management Services Agreement, HealthTech agreed, among other things, to provide PVHC with a CEO and to provide "supervision and effective management of the day-to-day business operations of [PVHC] through the CEO." (Management Services Agreement, Ex. A). The Management Services Agreement therefore contemplated that the CEO would be HealthTech's agent for carrying out HealthTech's core responsibilities under the Management Services Agreement.

6. After an application process, Defendant Paul Cardwell was selected by PVHC to fill the position of CEO. Pursuant to a letter agreement signed and dated February 10, 2011 by Cardwell, Cardwell accepted HealthTech's offer to become a HealthTech employee to serve as CEO of PVHC. (Letter Agreement, Ex. B.)

7. Cardwell started employment with HealthTech, serving as CEO for PVHC, on or about March 7, 2011. Pursuant to HealthTech's job description for his position, Cardwell had "onsite CEO-level oversight responsibility for management and operation of a facility [PVHC] under a management agreement with HealthTech . . . ." (Position Description, Ex. C.)  Cardwell also was expected to demonstrate "highly ethical conduct and moral behavior in personal and professional action and communication, consistent with the goals and objectives" of HealthTech. HealthTech paid Cardwell his agreed-upon salary while he served as CEO of PVHC.

8. On or about Friday, September 23, 2011, HealthTech learned from PVHC that PVHC's auditors had concerns about payments to Plake & Associates which had been made by PVHC without invoices from Plake & Associates or documented agreements between PVHC and Plake & Associates.  When I learned about these concerns and the large number of positions ostensibly being recruited by Plake & Associates for which PVHC already had paid, we immediately initiated an internal investigation of the matter as part of HealthTech's compliance and risk management programs.  I called Michael Plake at the cell phone number listed in some of the emails, and left a message.  Michael Plake called me back that day, September 23, and we spoke very briefly; he merely confirmed that he was Michael Plake of Plake & Associates.  The next day, September 24, I called him again, this time at a number I found on the Internet in West Lafayette, Indiana, and again left a message.  Plake returned the call, and this time we had a more substantive conversation.  I asked him questions about Plake & Associates, including asking why the Indiana Secretary of State had no record of Plake & Associates and why Plake & Associates did not have a website.  He told me that Plake & Associates was formed in Iowa in

2003, but that he was not sure it was properly set up in Indiana or Iowa.  He falsely represented Plake & Associates to be a bona fide physician recruiting company and told me that in prior years he had recruited only six to seven physicians per year but that during 2011 his business had "exploded."  He stated that he did not like "retained searches" because he had to give back the fee if he did not find a candidate, and at all times during our conversation he held himself out to be the person doing the purported recruiting.  He falsely told me that Plake & Associates had physician recruiting agreements in place with PVHC, and at no time did he state or otherwise indicate to me anything consistent with or supportive of the statements he later made in his criminal allocution to the effect that his role was only to provide a back office or accounting function for the business or that Paul Cardwell was the person providing the purported recruiting services; rather, Plake held himself out to be the person providing legitimate physician recruiting services through his company Plake & Associates.

     9.    During my conversation with Plake on September 24, and in a follow-up email to Plake that day, I asked to see a copy of at least one of the agreements he had told me were in place between PVHC and Plake & Associates.  The next morning, Plake instead sent me an email that attached a blank template agreement.  A true and correct copy of the email exchange between me and Plake is attached as Exhibit D, and the template agreement he emailed me is attached as Exhibit D-1.  The template agreement Plake sent to me matches the form of the agreements provided to PVHC by Plake later that same day, September 25, 2011.  I researched the template agreement sent to me by Plake and found a very similar agreement on the website

for a general recruiting firm located in White Plains, New York at www.paxtonresources.com/Agreement.htm.

10. At the same time I was communicating with Plake, Paul Cardwell had resigned his employment and then had requested to rescind his resignation on the basis of the recruiting agreements and invoices purportedly provided by Plake & Associates. On behalf of HealthTech, I immediately notified HealthTech's insurance carriers of the situation through the broker. I am the only lawyer at HealthTech and have a variety of responsibilities as General Counsel which requires my full-time attention on a daily basis. To my knowledge, no one else at HealthTech is qualified or experienced in conducting corporate investigations, and my other responsibilities made it impossible for me to conduct the investigation without outside assistance. I therefore retained the Nashville, TN office of Bass, Berry & Sims, and Eli Richardson in particular, to direct HealthTech's internal investigation of Plake & Associates and the actions of Paul Cardwell and to assist me in helping HealthTech effectively identify, navigate and manage the extensive business risks arising out of this potentially catastrophic situation. Mr. Richardson is a former Federal Bureau of Investigation Special Agent and Assistant United States Attorney and has substantial experience in fraud and white collar criminal investigations. A copy of his biographical information from the Bass, Berry & Sims website is attached as Exhibit E.

11. Bass, Berry & Sims, through Richardson and other employees, has continued to provide HealthTech with investigative services, proof of loss preparation services, federal authority liaison services, public relations services and, eventually, also with certain litigation services during the course of this matter. These services were, in my opinion, all entirely

necessary in order to manage and to protect properly HealthTech's legitimate business interests including, among others, to investigate Cardwell and Plake's actions to defraud PVHC, identify the nature and extent of Cardwell's and Plake's crimes and misconduct, prepare insurance proofs of loss describing the crimes as required by applicable policies of insurance, assist the Federal Bureau of Investigation and the Wyoming United States Attorney's Office with their investigations of the crime, assist in documenting the crimes, and assist in federal authorities' pursuit of criminal charges against Cardwell and Plake, assist in managing the complex public relations issues presented by Cardwell's and Plake's conduct and, eventually, defend the claims asserted by PVHC.  In addition, it was and continues to be my opinion that HealthTech owed a duty to PVHC to investigate the misconduct of Cardwell and Plake and to take action as quickly as possible to ascertain the means and extent of Cardwell and Plake's scheme.  HealthTech, with the assistance of Bass, Berry & Sims, met that duty through its prompt and effective investigation.

12. In February 2012, HealthTech learned that Cardwell had returned unexpectedly to the United States from Asia and directed Bass, Berry & Sims to file suit against him as promptly as possible.  A significant factor contributing to that decision was the fact that through the discovery process HealthTech could complete its investigation to identify the full extent of the misconduct and access relevant information and documentation otherwise unavailable to it or PVHC.  HealthTech retained the law firm of Littler Mendelson for very limited, supplemental assistance in preparing the Complaint, and on February 23, 2012, HealthTech filed suit against Cardwell in the United States District Court for the District of Wyoming.  (Doc. 1.) On April 10,

2012, after Cardwell was successfully served with process, he filed an answer and moved to dismiss HealthTech's Complaint. (Doc. 19.) On April 30, 2012, PVHC was permitted to intervene in this case, and asserted claims against HealthTech, as well as against Cardwell and Plake. (Docs. 26 and 27.)

13. Initially, HealthTech also retained the Wyoming firm of Williams, Porter, Day & Neville P.C. in connection with filing the Complaint and issuing subpoenas but quickly identified a potential conflict of interest that might arise relating to an entirely different matter. Therefore, shortly after filing this lawsuit, HealthTech retained Holland & Hart, LLP to represent it in this case. HealthTech specifically retained Bradley T. Cave and Joanna R. Vilos from that firm, and those counsel have represented HealthTech as lead litigation counsel since their retention. Because of the detailed factual knowledge that Eli Richardson of Bass, Berry & Sims gained through assisting HealthTech with the investigation of this matter and his expertise in white collar crime, Holland & Hart has utilized Mr. Richardson as an expert for consultation in this matter. Separately, Bass, Berry & Sims has continued also to provide, directly to HealthTech, services relating to HealthTech's ongoing investigation of the misconduct, communications with insurers concerning the proofs of loss, assistance to federal authorities and public relations. In addition, because of the complexity of the facts and resulting coverage questions, HealthTech also retained the firm of Bone, McAllester, Norton PLLC to represent HealthTech with respect to its coverage under applicable policies of insurance.

14. Since the retention of Bass, Berry & Sims; Littler Mendelson; Williams, Porter; Holland & Hart; and Bone, McAllester, Norton, HealthTech has incurred significant expense in

the areas of investigation, insurance coverage, federal law enforcement liaison and litigation. I have also participated extensively in the matter, and HealthTech has incurred travel expenses associated with my participation.

15.     As HealthTech's General Counsel, I am responsible for retaining HealthTech's outside counsel, negotiating the fees they charge, and evaluating their service and invoices. I am a sophisticated consumer of legal services, having practiced law (first as a litigator then as a healthcare regulatory lawyer) for approximately twenty (20) years and having retained and/or overseen the provision of services by outside counsel for HealthTech dozens of times in jurisdictions all over the United States, for matters including among others:  internal investigations, employment, healthcare regulatory, medical malpractice, insurance coverage, general commercial litigation, transactions, and corporate governance. It is my responsibility as General Counsel to manage closely and to keep as low as reasonably possible the amount that HealthTech spends for outside counsel. I have very closely managed the amount spent on outside counsel with respect to this matter, including by selecting qualified counsel knowledgeable about HealthTech and its business who could deliver efficiently the necessary services, by negotiating certain fee discounts, by closely overseeing the services they each provided to ensure that those services were necessary and provided in as efficient a manner as reasonably possible, and by reviewing the hourly rates, every invoice and every charge from Bass, Berry & Sims, Littler Mendelson, Williams, Porter,  Holland & Hart, and Bone, McAllester, Norton to ensure that the charges were reasonable, necessary and appropriate. I have found those rates, charges and invoices to be reasonable and appropriate and the work

reflected to be necessary to protect HealthTech's legitimate business interests and pursuant to its compliance and risk management programs, among others, for HealthTech's internal investigation, compliance with and recovery under applicable policies of insurance, cooperation with federal authorities, public relations and, eventually, litigation representation. These expenses were incurred to satisfy HealthTech's duty to PVHC and/or to protect HealthTech's interests. HealthTech's expenses in this matter are ongoing.

16. HealthTech has incurred all of the costs described above as a direct result of the actions of Cardwell and Plake. These costs were incurred to satisfy HealthTech's duty to PVHC, to protect HealthTech's interests and to defend HealthTech against PVHC's claims based on Cardwell and Plake's fraud and misconduct. If not for the fraud and misconduct by Cardwell and Plake, HealthTech would not have been required to incur any of the costs paid to Bass, Berry & Sims, Littler Mendelson, Williams, Porter, Holland & Hart, or Bone, McAllester, Norton.

17. On November 12, 2012, PVHC and HealthTech mediated the claims between them, and ultimately entered into a settlement agreement to resolve those claims. A copy of that Agreement is attached as Exhibit F (filed under seal). Under the terms of the Agreement, HealthTech was required to pay PVHC a cash amount and provide PVHC with additional services. These payments were expressly not to compensate PVHC for the money directly stolen from PVHC by Cardwell and Plake through their fraud, but for damages caused by Cardwell and Plake (over and above the amounts directly stolen from PVHC) on the basis of Cardwell and Plake's false representations and misconduct. HealthTech has made the cash payment required

by the settlement agreement, and is in the process of providing the additional services to PVHC required by the agreement.

18.     I have participated personally in reviewing and analyzing emails of Paul Cardwell and others related to this litigation. A large quantity of Paul Cardwell's emails were preserved and provided electronically to HealthTech by PVHC. Among others things, I, and others I have worked with, have examined emails directly related to Paul Cardwell's attempt to persuade applicable PVHC personnel to issue checks to Plake & Associates.  Among other emails, we have looked at both: (1) paper printouts of emails ("authorizing emails") presented by Paul Cardwell to PVHC personnel as justification for issuance of checks to PVHC; and (2) corresponding electronic versions of authorizing emails, as well as earlier emails ("precursor emails") that contained the same substance as the authorizing emails and clearly were used in the process of creating the authorizing emails. Based on our analysis, we were able to draw conclusions as to how Cardwell made the authorizing emails appear to have been written by Plake (which they were not, according to our analysis) and appear to have been emailed to Cardwell by Plake.

19.     We determined that Cardwell personally authored authorizing emails and then made the emails appear to have been written and sent by Plake. Our analysis revealed that Cardwell's method of creating emails that appeared to come from Plake typically consisted of Cardwell first drafting a precursor email and sending it from his PVHC email account to himself at the same PVHC email account, sometimes copying himself at his still-active White County

Memorial Hospital email account. Electronic versions of emails showed Cardwell repeatedly emailed himself text "signed" by Mike Plake that ultimately ended up in an authorizing email.

20. We were aware that a recipient of an email typically can choose to forward an email to whomever the recipient chooses, in which case the recipient can electronically edit (by simply using his keyboard) the name of the original sender of that email before actually forwarding it, i.e., before clicking the "send" option to send the email to the forwarding email address. Based on the emails we reviewed, it was clear that with respect to authorizing email after authorizing email, Cardwell forwarded to himself the precursor email, but only after changing the name of the sender of the original email from Cardwell to "Mike Plake." The very use of "Mike Plake," among other things, revealed that it was actually not Plake who was the original sender, because I personally heard Plake's wife, Kim Plake, explain and confirm at her deposition that Plake disliked being called "Mike" and would never have chosen to identify himself by that name.

21. Once Cardwell forwarded (to himself) the precursor email, it appeared to have come originally from Plake's email address when in fact it had originally come from Cardwell (and Cardwell's email address). Once Cardwell received this forwarded email, he could and did print out the email, often signed and often also dated it, and presented it as an authorizing email to justify issuance of a payment to Plake & Associates.

22. My colleagues and I also noted that Cardwell also created other kinds of emails – – besides authorizing emails – and made them appear to have been written by Plake. These other emails were not presented by Cardwell as justification and support for the issuance of a

particular check to Plake; rather, they served the more general purpose of creating the appearance that Plake was a legitimate recruiter providing actual recruiting services to PVHC. In general, to make these emails appear to have come from Plake, Cardwell employed the same method he employed with respect to authorizing emails, described above. However, on one occasion, Cardwell employed a different method, creating text for an email ostensibly written by Plake and then arranging to have his (Cardwell's) mother send the text to Plake so that Plake could actually send it to Cardwell; Plake did in fact receive the text from Cardwell's mother, on August 30, 2011, and later that day sent an email to Cardwell containing that text. This episode is further described in the brief in support of HealthTech's motion for summary judgment, and also at pages 46 to 51 of the transcript of the deposition of Barbara Cardwell.

23. My colleagues and I made some other relevant observations. First, the individual using the email name "Birdwell," at email address Birdwell17@comcast.net, is Cardwell's mother, Barbara Cardwell. This was entirely clear from the content and the "signature" contained in emails to or from that email address, and Barbara Cardwell confirmed this at her recent deposition by identifying emails to or from Birdwell17@comcast.net as her emails. In addition, our investigation revealed that the alleged email address mplake@m&a.com cannot be a valid email address, because an ampersand (&) cannot be used in a domain name; use of an ampersand would render such an email address invalid under existing protocols.

24. I have personally heard Kim Plake, at her recent deposition and once previously, explain that she has never done any recruiting for Plake & Associates. I have also personally verified that she is an Associate Professor of Pharmacy Practice at Purdue University.

FURTHER AFFIANT SAYETH NAUGHT

DATED April 29, 2013.

_____
Brenda Phillips
as General Counsel of HealthTech Management
Services, Inc.

STATE OF TENNESSEE   )
~~DAVIDSON~~ DAVIDSON ) ss.
COUNTY OF ~~WILLIAMSON~~ )

The foregoing instrument was acknowledged before me this 29 day of April, 2013, by Brenda Phillips, in her official capacity as General Counsel of HealthTech Management Services, Inc.

_____
Notary Public

Witness my hand and official seal.

My commission expires: 5/20/2014.

6158391_1.DOCX

