FILED
U.S. DISTRICT COURT
DIST. OF WYOMING

'13 MAY 23  PM 3 21

STEPHAN HARRIS, CLERK
CHEYENNE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| POWELL VALLEY HEALTH CARE, INC., | |
| Plaintiff, | |
| vs. | Case No. 12-CV-42-F |
| HEALTHTECH MANAGEMENT SERVICES, INC., | |
| Defendant/Crossclaimant, | |
| vs. | |
| PAUL CARDWELL and MICHAEL J. PLAKE, | |
| Defendants/Cross Defendants. | |

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on the combined summary judgment motion of

Plaintiff Powell Valley Health Care, Inc. (hereinafter "PVHC") and Defendant/Crossclaimant

HealthTech Management Services, Inc. (hereinafter "HealthTech"). Neither Paul Cardwell

(hereinafter "Cardwell") nor Michael Plake (hereinafter "Plake") have filed briefs in

opposition to the instant motion. Upon consideration of the record and the motion for

summary judgment, the Court concludes PVHC and HealthTech are entitled to summary judgment on all claims alleged against Defendants.

## Background

HealthTech provides hospital management services to client hospitals throughout the United States. PVHC is a hospital based in Powell, Wyoming, and a longstanding client of HealthTech.

On November 1, 2010, PVHC and HealthTech entered into a Management Services Agreement with PVHC whereby HealthTech agreed, among other things, to provide PVHC with a CEO and to provide effective hospital management through that CEO. HealthTech identified Defendant Cardwell to fulfill this role and, with the approval of PVHC, Cardwell assumed the title of CEO of PVHC in the spring of 2011.

Shortly thereafter, Cardwell allegedly implemented a scheme to defraud PVHC with the assistance of his friend, Defendant Plake. According to the allegations, this scheme involved several payments by PVHC to a fictitious recruiting firm, "Plake & Associates," for services that Cardwell and Plake both knew had not and never would be rendered. Cardwell and Plake allegedly provided phoney documentation and otherwise made false representations in order to secure payments from PVHC.

2

HealthTech commenced this action by filing a Complaint against Cardwell. HealthTech's Complaint asserts claims for Breach of Fiduciary Duty and Breach of the Implied Covenant of Good Faith and Fair Dealing (both in contract and tort). HealthTech seeks compensatory and punitive damages.

The Court subsequently granted PVHC leave to intervene[1] and PVHC filed a Crossclaim asserting claims for Fraud/Theft and Intentional Misrepresentation against Cardwell and Plake. PVHC's Crossclaim also asserted claims against HealthTech for Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing (in tort), and Negligence. PVCH's claims against HealthTech were ultimately dismissed by stipulation. In its remaining claims against Cardwell and Plake, PVHC seeks compensatory damages, attorneys fees and costs, plus pre and post judgment interest.

Finally, HealthTech asserted its own Crossclaim for indemnification against Cardwell; HealthTech seeks to be indemnified by Cardwell to the extent it is liable to PVHC. HealthTech's Crossclaim also asserts a claim against Plake under civil conspiracy theory and

_____

[1] Given PVHC's intervention, the parties filed a stipulated motion for realignment of the parties to avoid confusion. The Court granted this motion and ordered the parties realigned as follows: PVHC stands as Plaintiff, HealthTech as Defendant/ Crossclaimant, and Cardwell and Plake as Defendants.

argues Plake, as Cardwell's co-conspirator, is liable to HealthTech to the same extent as Cardwell.

Both Defendants were criminally charged on counts reflecting the same factual allegations as those outlined above. *See U.S. v. Plake*, 12-CR-81-F. In light of concerns of prejudice to Defendants, the Court granted Defendants' motion to temporarily stay the civil proceedings until Defendants had either pled guilty or judgment was entered at the conclusion of a criminal trial.

On September 17, 2012, Plake pled guilty to felony counts for conspiracy to commit wire fraud and money laundering. The elements of these two counts include: that Plake agreed with another person (Cardwell) to violate the law; that Plake knew the objective of the respective conspiracies (to commit mail and wire fraud and money laundering); that Plake knowingly and voluntarily participated in that agreement with Cardwell to violate the law; and that there was an interdependence among Plake and Cardwell, the members of the conspiracy. At his change-of-plea hearing, Plake described, under oath, the scheme that he and Cardwell agreed upon to defraud PVHC of nearly $850,000 over the course of six months.

The Court anticipated that Cardwell would also enter a guilty plea in the criminal case on August 29, 2012. However, Cardwell did not appear at his hearing. The Court issued a warrant for his arrest on the basis that he had applied for a U.S. Passport under another name.

Cardwell's attorneys represent that they have had no communication with their client since August 28, 2012. Despite multiple motions, the Court has not allowed Cardwell's attorneys to withdraw from this case.

On September 18, 2012, the Court entered an order placing this case back on the active civil docket and setting an initial pretrial conference. The Court set deadlines for the filing of dispositive motions at that time. In compliance with those deadlines, PVHC and HealthTech filed their combined motion for summary judgment on April 29, 2013.

Pursuant to Local Rule 7.1(b)(2)(A), responsive filings were due within fourteen days. Defendants did not file a timely response of any kind, nor did they request a continuance. Given the lack of response, and upon hearing no objection, the Court vacated the dispositive motion hearing.

On May 22, 2013, well after the dispositive motions response deadline had passed, Defendant Plake filed a response to the instant motion. This response is untimely and fails to substantively address the claims or arguments raised by PVHC and HealthTech on summary judgment. Instead, Plake's response merely encourages the Court to factor Plake's criminal restitution obligation in reaching its damages calculation. Plake's filing effectively amounts to no response.

5

Also on May 22, 2013, PVHC and HealthTech filed a "supplement" to their memorandum in support of summary judgment. This supplement does not alter the Court's analysis and therefore the Court similarly chooses not to consider this filing.

As of the date of this order, Defendant Cardwell has not made any responsive filing.

## Standard of Review

"The Court shall grant summary judgment if the movant shows that there is no genuine issue at to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Mata v. Anderson*, 635 F.3d 1250, 1252 (10th Cir. 2011). In determining whether summary judgment is appropriate, the Court views the evidence and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 1269 (10th Cir. 2011).

Under Rule 56(c), the moving party

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed.R.Civ.P. 56(c)). In cases such as this where the nonmoving party fails to respond, summary judgment cannot be granted without first

examining the motion to determine if the moving party has met its initial burden. If it has not, summary judgment must be denied "even if no opposing evidentiary matter is presented." *Reed*, 312 F.3d at 1194 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970)). On the other hand, a lack of response will not spare a nonmovant from an adverse ruling. Summary judgment may still be awarded if "all material facts asserted and properly supported . . . entitle the moving party to judgment as a matter of law." *Reed*, 312 F.3d at 1195.

The Court contrasts the standard above with that applied to district courts entering summary judgment as a result of a party's failure to comply with local rules such as 7.1(b)(2)(D), which allows the Court to deem an uncontested summary judgment motion confessed. "A district court's application of local rules to grant an uncontested summary judgment motion is generally treated as a sanction and requires application of the sanction analysis specified in *Meade v. Grubbs*, 841 F.2d 1512 (10th Cir.1988)." *Reed,* 312 F.3d at 1193. While the Court believes it has the authority to enter summary judgment against Cardwell and Plake on this basis and under *Meade*, it chooses instead to apply the standard summary judgment analysis given the severe nature of sanctions resulting in the final disposition of a party's claim. *See Meade*, 841 F.2d at 1520.

## Discussion

### I. Uncontested and Supported Facts

Apart from the actual testimony of Cardwell himself, PVHC and HealthTech provide a nearly complete picture of the relevant facts supporting their claims in this case. These facts are supported by attached affidavits and exhibits, the content and substance of which could be presented and admitted at trial. *See Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) ("To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury."). As neither Plake nor Cardwell has responded or otherwise produced evidence to avoid summary judgment, the Court considers the claims in light of the following well-supported factual history.

In March 2011, when Cardwell became the CEO of PVHC, Plake and Cardwell discussed and agreed to carry out a scheme by which Plake would pretend to operate a physician recruiting firm and would offer fictitious recruiting services in exchange for payment. *See* Exhibit 2 to Motion for Summary Judgment (hereinafter "Ex.___"), Official Transcript of Plake Change of Plea Proceedings, 20-21 (hereinafter "Plake Plea"). Based on Cardwell's misrepresentations to PVHC about the services to be provided by Plake & Associates, Plake received 12 checks from PVHC during the period of April to September

8

2011. *Id.* at 20. The 12 checks totaled $847,884. *See* Ex. 3, Declaration of PVHC Payables

Clerk Vicki Taylor, ¶ 37 (hereinafter "Taylor Decl.")

In developing their scheme, Plake and Cardwell agreed that Plake would retain 25%

of the amounts PVHC paid to Plake & Associates and Cardwell would receive the other 75%.

Docket Report for *Unites States v. Cardwell et al*, 12-CR-81-F, Doc. 48 [Plake COP Tr.] at

21. As Plake explained,

> I would deposit my checks into my business, Plake & Associates, which I was
> the dba of. For the first portion of the Powell Valley from March through
> about August, I would then mail checks back to [Cardwell], you know, in the
> amounts that we agreed upon. Starting in August, [Cardwell] wanted the
> checks – he wanted his portion wired to banks in Thailand, which I then did.

*Id*. at 22. Plake testified that he understood that "the funds that were being paid to [him] were

coming from the hospital on the representations that [he, Plake] was doing the

recruiting . . . ." *Id*. at 24. Yet Plake admits he did absolutely no recruiting for PVHC in

exchange for the payments he received. *Id*. at 27.

In August 2011, after receiving several payments from PVHC, Plake received a call

from PVHC's Chief Financial Officer inquiring about recruiting agreements for the services

Plake & Associates was purportedly providing. *Id.* at 22. Then, in September 2011, Plake

received phone calls from the General Counsel of HealthTech, Brenda Phillips, also inquiring

about the purported recruiting services. *Id*. at 22-23. Phillips had become suspicious about

9

the payments to Plake & Associates and called Plake on September 23 at a number for him that she had found on the Internet, and left a voice message. *See* Ex. 1, Affidavit of General Counsel Brenda Phillips, ¶ 8 (hereinafter "Phillips Aff."). Plake called her back, whereupon they spoke briefly, enough for Plake to confirm that he was the Michael Plake with Plake & Associates. *Id.* The next day, September 24, Phillips and Plake spoke again telephonically. *Id.* Phillips asked questions about Plake & Associates, including asking why the Indiana Secretary of State had no record of the business. *Id.* In response, Plake told Phillips that Plake & Associates was formed in Iowa in 2003, but that he was not sure it was properly set up in Indiana or Iowa. *Id.* He falsely represented to her that Plake & Associates was a bona fide physician recruiting company and told her that in prior years he had recruited only six to seven physicians per year but that during 2011 his business had "exploded." *Id.* Plake stated that he did not like "retained searches" because he had to give back the fee if he did not find a candidate and at all times during the conversation he held himself out to be the person doing the purported recruiting. *Id.* Plake falsely told Phillips that Plake & Associates had physician recruiting agreements in place with PVHC. *Id.* During Phillips' conversation with Plake on September 24, and in a follow up email, Phillips asked to see a copy of at least one of the agreements he said were in place between PVHC and Plake & Associates. *Id.* The next

10

day, Plake emailed Phillips a mere template agreement, not completed agreements as she had

requested. *Id*. at ¶ 9; *see* Exs. D and D1 to Phillips Aff.

Following these contacts from PVHC and HealthTech, Plake and Cardwell

"concocted recruiting agreements and dated them at dates that would coincide
with, you know, when the fictitious recruiting activities were going to occur.
[Plake] also – [ ] sent via e-mail – [ ] sent all of this via email. [Plake] sent the
recruiting agreements and invoices. [Plake] sent invoices for all of these based
on the checks that [he] had received and sent all of that via e-mail through a
PDF file to the CFO."

Plake COP Tr. at 23; *see* Taylor Decl., ¶ 36. On September 25, 2011, PVHC received an

email from Plake attaching the concocted recruiting contracts and invoices and purporting

to provide an update on the recruiting efforts. Taylor Decl., ¶ 36. Three days later, on

September 28, 2011, Plake registered "Plake & Associates, LLC" with the Indiana Secretary

of State. *See* Ex. 4.

On March 15, 2011, just days after arriving at PVHC, Cardwell emailed PVHC's Vice

President for Physician Services, suggesting that for physician-recruiting, PVHC retain "an

Iowa based firm"[2] Cardwell had worked with for the last five years and which had

---

[2] Cardwell falsely characterized Plake & Associates as based in Iowa—where, as
noted, Plake later told HealthTech's General Counsel he formed Plake & Associates
approximately a decade prior. Phillips Aff., ¶ 8.

11

"successfully recruited 23 physicians to White County Memorial Hospital."[3] Ex. 5. Likewise,

sometime shortly after arriving at PVHC, Cardwell notified the accounting department that

he had engaged a firm called Plake & Associates to provide recruiting services for PVHC.

Taylor Decl., ¶ 3. He told the accounting department he had worked with Plake & Associates

in the past and that the firm had always done an excellent job of sending him candidates. *Id.*

at ¶ 35. Cardwell never revealed the fact that Plake in fact was a longstanding friend of

Cardwell's dating all the way back to high school. *See* Exss. 5-10; *see also* Ex. 22,

Deposition of Barbara Cardwell, 40-41.

On March 21, 2011, Cardwell contacted Plake to "chat" and request the address and

federal tax ID number for Plake & Associates. *See* Ex. 11. Sometime later that month,

PVHC's Payables Clerk told Cardwell she needed a completed IRS Form W-9 from Plake

& Associates before she could release any payments. Taylor Decl., ¶ 3. Soon after that,

Taylor received a completed W-9 from Cardwell for "Michael J. Plake, Plake & Associates

LLC." *Id.* at ¶ 5. In reliance upon the direction and authorization of Cardwell as the CEO of

---

[3] According to a federal indictment filed against Plake and Cardwell in Indiana
(N.D. Ind. Case No. 2:12-cr-00161) and transferred to this Court pursuant to Fed. R.
Crim. P. 20, the two men together had defrauded White County Memorial Hospital in
Monticello, Indiana pursuant to a conspiracy lasting from approximately March 2003
through October 2009 in a similar scheme involving non-existent but alleged recruiting
services performed by Plake & Associates.

PVHC, and with the belief that Cardwell had in fact obtained PVHC's Board's approval, as

Cardwell claimed to have done, PVHC's accounting department began issuing a series of 12

payments to Plake & Associates. *Id*. at ¶ 36. During the period of April 2011 to September

2011, the following 12 payments were requested by Cardwell and issued by the PVHC

accounting department:

- On or about April 4, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $57,200 payable to Plake & Associates, purportedly for "physician recruitment x 2." *Id*. at ¶ 6.

- Based on the April 4, 2011 authorization from Cardwell, on April 7, 2011, the PVHC accounting department issued check number 122761, made payable to Plake & Associates, LLC in the amount of $57,200. *Id*. at ¶ 7.

- On or about May 9, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $72,643 payable to Plake & Associates, purportedly for "physician recruitment." *Id*. at ¶ 8.

- Based on the May 9, 2011 authorization from Cardwell, on June 11, 2011, the PVHC accounting department issued check number 123510, made payable to Plake & Associates, LLC in the amount of $72,643. *Id*. at ¶ 11.

- On or about June 15, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $30,254 payable to Plake & Associates for recruiting services. *Id*. at ¶ 12.

- Based on the June 15, 2011 authorization from Cardwell, on June 18, 2011, the PVHC accounting department issued check number 124349, made payable to Plake & Associates, LLC in the amount of $30,254. *Id*. at at ¶ 13.

13

- On or about June 20, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $33,500 payable to Plake & Associates for recruiting services. *Id*. at  at ¶ 14.

- Based on the June 20, 2011 authorization from Cardwell, on June 23, 2011, the PVHC accounting department issued check number 124522, made payable to Plake & Associates, LLC in the amount of $33,500. *Id*. at ¶ 15.

- On or about June 28, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $96,150 payable to Plake & Associates for recruiting services. *Id*. at ¶ 16.

- Based on the June 28, 2011 authorization from Cardwell, on June 30, 2011, the PVHC accounting department issued check number 124588, made payable to Plake & Associates, LLC in the amount of $96,150. *Id*. at ¶ 17.

- On or about July 14, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $90,675 payable to Plake & Associates for recruiting services. *Id*. at ¶ 18.

- Based on the July 14, 2011 authorization from Cardwell, on July 14, 2011, the PVHC accounting department issued check number 124946, made payable to Plake & Associates, LLC in the amount of $90,675. *Id*. at ¶ 19.

- On or about July 20, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $57,500 payable to Plake & Associates for recruiting services. *Id*. at ¶ 20.

- Based on the July 20, 2011 authorization from Cardwell, on July 20, 2011, the PVHC accounting department issued check number 124991, made payable to Plake & Associates, LLC in the amount of $57,500. *Id*. at ¶ 21.

- On or about July 26, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $72,825 payable to Plake & Associates for recruiting services. *Id*. at ¶ 22.

14

- Based on the July 26, 2011 authorization from Cardwell, on July 28, 2011, the PVHC accounting department issued check number 125186, made payable to Plake & Associates, LLC in the amount of $72,825. *Id*. at ¶ 23.

- On or about August 17, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $83,185 payable to Plake & Associates for recruiting services. *Id*. at ¶ 24.

- Based on the August 17, 2011 authorization from Cardwell, on August 17, 2011, the PVHC accounting department issued check number 125547, made payable to Plake & Associates, LLC in the amount of $83,185. *Id*. at ¶ 25.

- On or about September 7, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $79,425 payable to Plake & Associates for recruiting services. *Id*. at ¶ 29.

- Based on the September 7, 2011 authorization from Cardwell, on September 8, 2011, the PVHC accounting department issued check number 126245, made payable to Plake & Associates, LLC in the amount of $79,425. *Id*. at ¶ 30.

- On or about September 12, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $83,889 payable to Plake & Associates for recruiting services. *Id*. at ¶ 31.

- Based on the September 12, 2011 authorization from Cardwell, on September 13, 2011, the PVHC accounting department issued check number 126293, made payable to Plake & Associates, LLC in the amount of $83,889. *Id*. at ¶ 32.

- On or about September 19, 2011, Cardwell authorized the PVHC accounting department to issue a check in the amount of $90,638 payable to Plake & Associates for recruiting services. *Id*. at ¶ 33.

- • Based on the September 19, 2011 authorization from Cardwell, on September 20, 2011, the PVHC accounting department issued check number 126434, made payable to Plake & Associates, LLC in the amount of $90,638. *Id*. at ¶ 34.

The payments authorized by Cardwell and paid by PVHC to Plake & Associates totaled $847,884 –75% of which was ultimately provided to Cardwell by Plake in accordance with their agreement. Plake COP Tr. at 11. Printouts of emails, often but not always signed by Cardwell, constituted the sole documentation Cardwell used to authorize payments in most cases. *See* Taylor Decl., ¶¶ 14-19, 22-23, 31-34. Defendants have evidence and suspicion that these emails were likely authored by Cardwell and then made to appear to have been written and sent by Plake. *See* Exss. K, M, O, S, BB, DD to Taylor Decl.

During the course of receiving the payment requests from Cardwell, PVHC's accounting department asked Cardwell to provide "receipts" from Plake & Associates for the payments. *See* Taylor Decl., ¶¶ 9-10. On several occasions, the accounting department also asked Cardwell to provide recruiting contracts and invoices from Plake & Associates. *Id*. Cardwell responded that Plake had prepared contracts and invoices for all of the recruiting services and would be "resending" those documents soon. *Id*. at ¶ 35. The requested documents finally arrived on September 25, 2011, after Plake and Cardwell "concocted recruiting agreements and dated them at dates that would coincide with … [the dates] when

the fictitious recruiting activities were going to occur." Plake COP Tr at 23; Taylor Decl., ¶ 36.

During the course of Cardwell's status as a HealthTech employee serving as PVHC's CEO, HealthTech upheld its obligation under the employment agreement to pay Cardwell his agreed-upon salary for the period of March 2011 to September 2011. Phillips Aff., ¶ 7. PVHC, for its part, reimbursed HealthTech for Cardwell's services by paying HealthTech an amount equivalent to Cardwell's salary plus an additional 30% of Cardwell's salary to cover his benefits administration. In all, PVHC made payments to HealthTech totaling $143,944.83 as reimbursement for Cardwell's salary and benefits administration. Taylor Decl., ¶¶ 39-40.

*II. Claims Brought by PVHC Against Cardwell and Plake*

*A. Fraud*

PVHC asserts claims of fraud and intentional misrepresentation against both Cardwell and Plake. Fraud must be proven by clear and convincing evidence and pled with particularity. *Excel Const., Inc. v. HKM Eng'g, Inc.*, 228 P.3d 40, 48 (Wyo. 2010) (citing W.R.C.P. 9(b)). Fraud is established when a plaintiff demonstrates, (1) the defendant made a false representation intended to induce action by the plaintiff; (2) the plaintiff reasonably believed the representation to be true; and (3) the plaintiff relied on the false representation

17

and suffered damages. *Id*. The Court finds PVHC has met its burden by demonstrating that there are no genuine issues as to any material fact with regard to its claims of fraud. Given the lack of a response from either Defendant, PVHC is thus entitled to judgment as a matter of law.

In order to prove the first element of fraud, the plaintiff must show that the misrepresentation was made intentionally, with knowledge of its falsity. *Birt v. Wells Fargo Home Mortg., Inc.*, 75 P.3d 640, 656 (Wyo. 2003). Here, even viewing the evidence in the light most favorable to Defendants, the uncontested evidence clearly establishes that Cardwell and Plake made affirmative misrepresentations to PVHC that they knew to be false. Cardwell created the impression that Plake & Associates was actively recruiting for PVHC, authorized payments for fictitious services, falsified documents and misled PVHC personnel regarding his relationship with Plake & Associates and its value to the hospital. Cardwell created a false impression that Plake & Associates was a legitimate business performing work on behalf of the hospital. The record features several specific examples of representations by Cardwell to this end.

Plake, in turn, accepted and endorsed 12 checks over the course of six months—each time representing to PVHC that he was in fact carrying out the recruiting activities on which the payments were premised. Plake also told Brenda Phillips, HealthTech's General Counsel,

18

that Plake & Associates was a legitimate recruiting firm and that Plake was personally recruiting on PVHC's behalf. At his change of plea hearing, Plake testified that he understood that the 12 checks he received were from PVHC "on the representations that [he] was doing the recruiting." Plake COP Tr. at 24.

The record before the Court also establishes the remaining elements of fraud by clear and convincing evidence. PVHC reasonably believed the representations of Cardwell and Plake to be true. These combined representations led PVHC staff to form the erroneous impression that checks should be issued to Plake & Associates for services rendered. Notably, conduct or words which tend to produce an erroneous impression may satisfy the plaintiff's burden of proving fraud. *Sundown, Inc. v. Pearson Real Estate Co., Inc.*, 8 P.3d 324, 330 (Wyo. 2000). Given the extent of the deception orchestrated by Cardwell and Plake, PVHC relied on the information communicated by both men and issued checks as a result. These checks totaled $847,884 and satisfy the damages element necessary to prove fraud.

Given these conclusions on PVHC's fraud claim, the claim of intentional misrepresentation in Count Two of PVHC's Crossclaim, which arises from and relates to the same set of facts as the fraud claim, need not be considered further.

## B. Theft/Conversion

The actions of Cardwell and Plake also constitute conversion as a matter of law, as

alleged in Count One of PVHC's Crossclaim for fraud/theft.

Conversion occurs when a person treats another's property as his own, and denies the

true owner the benefits and rights of ownership. *Johnson v. Reiger*, 93 P.3d 992, 999 (Wyo.

2004). In order to establish a conversion claim, a plaintiff must show that:

(1) he had legal title to the converted property; (2) he either had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff his rights to use and enjoy the property; (4) in those cases where the defendants lawfully, or at least without fault, obtained possession of the property, the plaintiff made some demand for the property's return which the defendant refused; and (5) the plaintiff has suffered damage by the loss of the property.

*Id.*

It is an old and well-established principle that money may be the subject of a

conversion action, so long as it is identifiable. *Ferguson v. Coronado Oil Co.*, 884 P.2d 971,

978 (Wyo. 1994). Here, the checks paid to Plake & Associates were readily identifiable and

belonged to PVHC. It is beyond dispute that Cardwell and Plake had no rightful entitlement

to these 12 checks—all of which were made payable to Plake & Associates for recruiting

services that neither man preformed. At various points in time, both Cardwell and Plake

exercised dominion over the property in a manner that deprived PVHC of its rights.

20

Specifically, Cardwell secured the payment of these checks, and Plake received them and divided the amounts. Based on this fraud, PVHC paid $847,884 for recruiting services that were never performed. PVHC was thus denied its right to use its property as represented and so as to better the hospital. In sum, PVHC received nothing in exchange for the monies it paid to Plake & Associates and suffered damages as a result. Cardwell and Plake participated together in the conversion and it took their joint action to create these damages.

*III. Claims Brought by HealthTech*

*A. Breach of the Covenant of Good Faith and Fair Dealing (Contract) Against Cardwell*

Counts Two and Three of HealthTech's Complaint assert claims for breach of the implied covenant of good faith and fair dealing in both tort and contract, respectively. Because HealthTech does not present separate argument in support of its tort claim on summary judgment, the Court will only consider this claim as it sounds in contract.

"Every contract imposes on each party a duty of good faith and fair dealing in its performance and enforcement." *Ultra Resources, Inc. v. Hartman*, 226 P.3d 889, 919 (Wyo. 2010).

> Under Wyoming law, the implied covenant requires that neither party to a commercial contract act in a manner that would injure the rights of the other party to receive the benefit of the agreement. It requires the parties to act in accordance with their agreed common purpose and each other's justified

21

> expectations. A breach of the implied covenant occurs when a party interferes
> or fails to cooperate in the other party's performance.

*Universal Drilling Co., LLC v. R & R Rig Service*, LLC, 271 P.3d 987, 999 (Wyo. 2012). The

implied covenant may not be used to create new rights or duties beyond those agreed to by

the parties. *City of Gillette v. Hladky Const., Inc.*, 2008 WY 134, 196 P.3d 184, 196 (Wyo.

2008). In order to establish breach of the implied covenant, the plaintiff must demonstrate

that the other party acted in "bad faith" by "violating community standards of decency,

fairness or reasonableness." *Universal Drilling*, 271 P.3d at 999.

In exchange for the salary and benefits provided under his at-will employment

contract with HealthTech, Cardwell agreed to serve as CEO of PVHC. Cardwell breached

the implied covenant of good faith and fair dealing when he secured and authorized payments

of PVHC funds to his friend—and ultimately, to himself, under the guise of compensation

for legitimate services rendered. The record clearly establishes that Cardwell knew that Plake

& Associates was a fictitious entity, and that Cardwell himself created this fiction. These

actions amount to self-dealing and misappropriation of funds. Needless to say, Cardwell's

theft did not comport with the agreed-upon common purpose of the employment contract, the

justified expectations of HealthTech, or community standards of decency, fairness or

reasonableness. By embezzling funds from HealthTech's client, Cardwell deprived

HealthTech of the benefit of its bargained-for employee. Further, Cardwell failed to cooperate in HealthTech's performance under the employment contract by pretending to perform as CEO while secretly engaging in activities for which HealthTech would otherwise never have provided compensation. As a matter of law, these undisputed material facts entitle HealthTech to judgment in its favor against Cardwell.

### B. Breach of Fiduciary Duty Against Cardwell

Count One of the Complaint alleges that Cardwell breached the fiduciary duty he owed to HealthTech by misappropriating PVHC funds for his own use. In order to recover on this claim, HealthTech must show a relationship giving rise to a fiduciary duty, a breach of that duty, and resulting actual damages. *See Skane v. Star Valley Ranch Ass'n*, 826 P.2d 266, 269 (Wyo. 1992). The record on summary judgment, even viewed in the light most favorable to Cardwell, establishes that Cardwell owed, and breached, a fiduciary duty to HealthTech. The uncontested facts entitle HealthTech to judgment as a matter of law with regard to this claim.

Of the two essential kinds of fiduciary relationships, the first arises from specific legal relationships, such as those of trustee and beneficiary and principal and agent. *Martinez v. Associates Fin. Servs. Co. of Colorado, Inc.*, 891 P.2d 785, 789 (Wyo. 1995). In such cases, the relations are presumed to be essentially fiduciary. *Id.* The second kind of fiduciary

relationship is not easily defined, but can be implied "due to the factual situation surrounding the involved transactions and the relationship of the parties." *Id.* (quoting *Denison State Bank v. Madeira*, 640 P.2d 1235, 1241 (1982)). Whether a duty exists is generally a question of law for the court to decide. *Johnson v. Reiger*, 93 P.3d 992, 999 (Wyo. 2004). However, determining whether a specific legal or implied relationship exists may necessarily involve factual questions.

The record establishes that Cardwell was HealthTech's employee. The employer/ employee relationship is not among those legal relationships presumed to be fiduciary in nature. However, the distinction between a principal and agent relationship and the relationship between an employer and employee is one of degree only. 2A C.J.S. Agency § 21 (1958). An agent usually has greater authority to act for the principal, such as by negotiating contracts and representing his principal in business dealings, while an employee typically acts at the direction of the employer. *Id.* (citing *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 599 (Iowa 1999)); *see Long v. Great W. Life & Annuity Ins. Co.*, 957 P.2d 823, 829 (Wyo. 1998)(holding an employee's discretionary power and control necessarily required the Court to consider whether a fiduciary relationship existed.). In Wyoming, "[a] relationship of agency is established when two parties agree that one, the agent, shall act on behalf of and subject to the control of the other, the principal." *Maverick*

24

*Motorsports Group, LLC v. Wyo. Dep't of Revenue*, 253 P.3d 125, 133 (Wyo.2011)). In other

words, an agency is created when one party is empowered or given legal authority to act on

the other's behalf. *Redco Const. v. Profile Properties, LLC*, 271 P.3d 408, 418-19 (Wyo.

2012).

The uncontested facts before the Court establish that an agency relationship was

created between HealthTech and Cardwell. Cardwell was not just a low to mid-level

employee of HealthTech, but the assigned Chief Executive Officer of PVHC. According to

HealthTech's job description for this position, Cardwell was expected to demonstrate "highly

ethical conduct and moral behavior in personal and professional action and communication,

consistent with the goals and objectives" of HealthTech. Phillips Aff., Ex. C. Cardwell had

"onsite CEO-level oversight responsibility for management and operation of a facility

[PVHC] under a [Management Services Agreement] with HealthTech . . .." Phillips Aff.,

Ex. C. Under this agreement, HealthTech agreed, among other things, to provide PVHC with

a CEO and to provide "supervision and effective management of the day-to-day business

operations of [PVHC] through the CEO." *Id.* at Ex. A. "Specifically, [HealthTech], through

the CEO [Cardwell], shall have responsibility and commensurate authority ... to lawfully and

reasonably ensure that [PVHC] has in place appropriate systems and personnel to carry out"

a variety of duties from personnel administration, collection of accounts, purchase

25

agreements, contract services, among other numerous duties. *Id.* In short, HealthTech's ability to satisfy its managerial services obligations to PVHC was dependent upon the CEO, Cardwell, who was empowered to act on HealthTech's behalf in the day-to-day management of PVHC. Finally, Cardwell accepted these corporate responsibilities in taking the Hospital Chief Executive Officer (CEO) position. *Id.* at Ex. B.

The Wyoming Supreme Court has said that a fiduciary duty does not arise by a unilateral decision to repose trust and confidence; it derives from "the conduct or undertaking of the purported fiduciary." *Long v. Great W. Life & Annuity Ins. Co.*, 957 P.2d 823, 829 (Wyo. 1998) (quoting *Martinez*, 891 P.2d at 790.) Accordingly, a fiduciary is "[a] person having duty, created by his own undertaking, to act primarily for another's benefit in matters connected with such undertaking." *Id.*; *see also Lee v. LPP Mortg. Ltd.*, 74 P.3d 152, 162 (Wyo. 2003) (finding bank owed no fiduciary duty because there were no facts showing its voluntary assumption of any duty). In this case, Cardwell accepted HealthTech's offer to become a HealthTech employee by serving as CEO of PVHC. Phillips Aff., Ex. B. This position involved obligations to PVHC (and to the public it served), but it also involved obligations to HealthTech to effectively and ethically manage the affairs of its contracted client. Cardwell voluntarily assumed those obligations and, in so doing, became partially responsible for HealthTech's performance under its own contract. In sum, the record

26

establishes that Cardwell voluntarily assumed heightened responsibilities and served as a business representative of HealthTech. This created an agency relationship between HealthTech and Cardwell.

"[A]n agent acts in a fiduciary capacity and owes to the principal the utmost good faith." *Snearly v. Hockett*, 352 P.2d 230, 33-34 (Wyo. 1960). Cardwell's conduct did not comport with this good faith duty as a matter of law; his false representations and theft served his interests alone and harmed the interests of HealthTech. By virtue of his position as CEO, Cardwell used company time and resources for work that secretly profited himself. This type of self-dealing by an employee regularly forms the basis for employer claims of breach of fiduciary duty. *Crick*, 604 N.W.2d at 599; *see, e.g. Am. Map Corp. v. Stone*, 264 A.D.2d 492, 493 (N.Y. 1999) ("The defendant's admissions that by the use of fictitious buyers he was able to retain for his own account a share of the proceeds due his employer conclusively establish a breach of the fiduciary duty owed to his employer."). Cardwell's actions resulted in actual damages to HealthTech, including deprivation of services for which HealthTech had contracted.

27

## C. Civil Conspiracy Claim Against Plake

In Count Five of its Crossclaim,[4] HealthTech asserts a claim of civil conspiracy against Plake.[5] A claim of civil conspiracy consists of the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate cause thereof." *White v. Shane Edeburn Const., LLC*, 285 P.3d 949, 958 (Wyo. 2012) (quoting *McKibben v. Chubb*, 840 F.2d 1525, 1533 (10th Cir.1988)). HealthTech has demonstrated that there are no genuine issues of material fact with regard to this claim and that it is entitled to judgment as a matter of law on the record before the Court.

According to the Crossclaim, "Defendants Cardwell and Plake combined with one another to pursue the mutual object of improperly obtaining PVHC's money through the operation of a straw company (as defined in HealthTech's Complaint, and specifically referring to Plake and Associates and Michael J. Plake)." The record before the Court clearly establishes that Plake and Cardwell agreed to set up a fictitious business in order to steal funds from PVHC. Not only did Plake admit this at his change of plea proceeding, but

---

[4]Doc. No. 31, p. 21.

[5]A civil conspiracy claim may be brought against any one or more of the members of a conspiracy. 16 Am. Jur. 2d Conspiracy § 66 (citing *Envirotech, Inc. v. Thomas*, 259 S.W. 577, 586 (Mo. Ct. App. E.D. 2008)).

HealthTech has presented overwhelming circumstantial evidence indicating that Plake and Cardwell knew one another, that they worked together to deceive PVHC and HealthTech, and that they divided funds among themselves over the course of several months with the knowledge that those funds rightfully belonged to PVHC. These facts are sufficient to prove the first three elements of civil conspiracy.

As to the final elements, the Wyoming Supreme Court has held that a plaintiff cannot claim civil conspiracy without an underlying cause of action in tort. *Cent. Wyoming Med. Lab., LLC v. Med. Testing Lab, Inc.,* 43 P.3d 121, 126 (Wyo. 2002). This means, in effect, that Wyoming does not recognize an independent cause of action for conspiracy where there is no underlying "unlawful overt act" in the form of a tort claim, or where the underlying tort claim has failed. An agreement, by itself, is not actionable.

HealthTech has successfully alleged an underlying cause of action in tort against Cardwell for breach of fiduciary duty. While this claim does not directly involve Plake, it is sufficient to support a claim of civil conspiracy. The Wyoming Supreme Court has not held that an underlying tort action must lie against all conspirators; all that is required is an actionable tort claim against one of the conspirators. This occurs when the plaintiff successfully proves that he was damaged as a result of the tortious act of one or more of the alleged conspirators and that the tortious act occurred in pursuance of the conspiracy.

*Envirotech*, 259 S.W.3d at 587; *see Dodson v. Allstate Ins. Co.*, 47 S.W.3d 866, 876 (Ark. 2001) ("[R]ecovery may be had for damages caused by acts committed pursuant to the conspiracy.") It is evident that Cardwell breached his fiduciary duty to HealthTech in furtherance of his conspiracy with Plake. As discussed above, HealthTech suffered damages as a result of Cardwell's tortious actions.  Therefore, HelathTech is entitled to judgment as a matter of law on its civil conspiracy claim against Plake, as Cardwell's co-conspirator.

*IV. Damages*

      *A. PVHC*

As stated, PVHC is entitled to judgment as a matter of law as to its claims against Cardwell and Plake for both fraud and conversion.

Damages may be awarded to PVHC on its fraud claim for any loss suffered as a consequence of its reliance on the false representations of Cardwell and Plake–i.e. the funds diverted as a result of Defendants' fraud. Similarly, "[t]he proper measure of damages for conversion of property is the actual value of the property converted and may include reasonable expenses incurred in an effort to recover possession of the property." *Alcaraz v. State*, 44 P.3d 68, 71 (Wyo. 2002). PVHC does not provide evidence regarding expenses incurred as a result of any efforts to recover its converted funds.

Notably, "[o]ne whose money or property is taken by fraud or embezzlement, or by conversion, is entitled to restitution measured by the defendant's gain if the victim prefers that remedy to the damages remedy." *Cross v. Berg Lumber Co.*, 7 P.3d 922, 933 (Wyo. 2000) (citing Dobbs, *Law of Remedies* § 4.1(1) p.553 (1993)). PVHC has not provided evidence of either Defendant's gain beyond the funds embezzled such that the Court could award damages in restitution.

In this case, the damages to PVHC for its claims of fraud and conversion are overlapping and the Court may not award double damages. Whether viewed as loss suffered or the actual value of the funds diverted, PVHC has established $847,884.00 in compensatory damages as a matter of law. Cardwell and Plake are jointly and severally liable for this amount, together with interest. *See W. Nat. Bank of Casper v. Harrison*, 577 P.2d 635, 641 (Wyo. 1978) ("[A]ll those who participate actively in any manner in the commission of a tort are jointly and severally liable therefor, it being indivisible."); *Lieberman v. Mossbrook*, 208 P.3d 1296, 1311 (Wyo. 2009) ("In conversion cases, the equivalent of interest on the value of converted property is recoverable as an element of damages.").

In its Crossclaim, PVHC also seeks attorneys fees and costs.

Wyoming subscribes to the American rule regarding recovery of attorney fees. *Schlesinger v. Woodcock*, 35 P.3d 1232, 1239 (Wyo. 2001); *Cline v. Rocky Mountain, Inc.*, 998 P.2d 946, 949 (Wyo.2000). Under the American rule, each

> party is generally responsible for his own attorney fees. *Id*. However, a
> prevailing party may be reimbursed for his attorney fees when express
> statutory or contractual authorization exists for such an award. *Id*. Moreover,
> an exception may be applied in the circumstances of fraud and the corollary
> award of punitive damages. *See Olds v. Hosford*, 354 P.2d 947, 950
> (Wyo.1960) (recognizing an exception to the general rule denying recovery of
> attorney fees and costs in a replevin action where "fraud, malice, oppression
> or wil[l]ful wrong" can be shown).

*Alexander v. Meduna*, 47 P.3d 206, 220-21 (Wyo. 2002).

PVHC has demonstrated Defendants engaged in fraud and otherwise engaged in willful wrongs. Accordingly, under the recognized fraud exception, PVHC is entitled to an award of all attorney fees and costs attendant to the entire course of this litigation.

Notably, PVHC does not assert a claim for punitive damages in its Crossclaim. The Court will not consider a punitive damages award to PVHC for this reason.

### B. HealthTech

HealthTech is entitled to judgment as a matter of law with regard to its claims against Cardwell for breach of the implied covenant of good faith and fair dealing and for breach of fiduciary duty. The proper measure of damages under these claims is effectively the same. *See Cathcart v. State Farm Mut. Auto. Ins. Co.*, 123 P.3d 579, 589 (Wyo. 2005) (recognizing that a breach of the implied covenant of good faith and fair dealing is actionable in contract for compensatory damages); *City of Kemmerer v. Wagner*, 866 P.2d 1283, 1287 (Wyo. 1993)

(quoting *Atlas Constr. Co. v. Slater,* 746 P.2d 352, 359 (Wyo.1987) ("In tort cases, the measure of damages is the amount which will compensate a claimant for *all* the detriment proximately caused by the tort-feasor's breach of duty.")) HealthTech is also entitled to hold Plake jointly and severally liable in light of its successful civil conspiracy claim.

It is evident that Cardwell and Plake are jointly and severally liable to HealthTech for Cardwell's salary and benefits. Cardwell breached his fiduciary duty to HealthTech in furtherance of his conspiracy with Plake to defraud PVHC. Given that this conspiracy directly coincided with Cardwell's stint as CEO, Cardwell cannot rightfully claim he is entitled to any compensation received for this employment. *See Am. Map Corp. v. Stone,* 264 A.D.2d 492, 493 (N.Y. 1999) ("[T]he employee or agent . . . forfeits his right to compensation for services rendered by him if he proves disloyal."); *Gelfand v. Horizon Corp.,* 675 F.2d 1108, 1111-12 (10th Cir. 1982). Stated otherwise, Cardwell's actions deprived HealthTech of the services for which it bargained. Based on the uncontested evidence, HealthTech paid Cardwell $143,944.83 in salary and benefits. Cardwell and Plake are jointly and severally liable for this amount.

HealthTech also claims that it should be awarded damages to cover the investigation and coverage costs it incurred as a consequence of Cardwell's breach of the implied covenant and his fiduciary duty. The Court agrees that HealthTech is entitled to such damages, but

only to the extent that HealthTech incurred costs to investigate Cardwell's actions and to ultimately replace him as CEO.

In addition, HealthTech seeks attorney's fees incurred in defending against the claims brought by PVHC. HealthTech asserts that such an award is appropriate under the "tort of another" doctrine. This doctrine offers an exception to Wyoming's general rule that attorney's fees are not recoverable and provides:

> One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action.

*Sundown, Inc. v. Pearson Real Estate Co., Inc.*, 8 P.3d 324, 333 (Wyo. 2000) (quoting Restatement (Second) of Torts § 914 (1979)).

The "tort of another" doctrine is not appropriately applied to this case. While HealthTech was indeed required to protect its interests by defending itself against claims asserted by a third person (PVHC), these claims did not involve "the tort of another." To the contrary, PVHC's claims against HealthTech stemmed from HealthTech's own alleged wrongdoing in breaching its contract with PVHC and in negligently hiring/supervising Cardwell. To the extent that HealthTech might argue that these claims only arose due to Cardwell's misconduct, this may be. Yet HealthTech cannot effectively claim Cardwell as

34

its agent in one context—i.e. when arguing that Cardwell owed HealthTech a fiduciary duty–

and completely disown him as "another" in the context of damages. This logic similarly

precludes HealthTech from recovering the amounts paid to settle the claims brought against

it by PVHC pursuant to the settlement agreement filed under seal. Notably, indemnity

between tortfeasors is only appropriate if two or more persons are liable in tort to a third

person for the *same harm*. Again, the claims asserted by PVHC against HealthTech and

Cardwell/Plake involve entirely distinct tortious conduct.

In its initial Complaint, HealthTech also asserted a claim of punitive damages against

Cardwell. Based on the outrageous conduct involved in this case, the Court concludes that

HealthTech is entitled to punitive damages as a matter of law. However, because the law

provides no specific measure for quantifying punitive damages, the amount to be awarded

rests almost totally within the discretion of the jury and may not properly be awarded by the

Court outside of a bench trial. *See Town of Jackson v. Shaw,* 569 P.2d 1246, 1251 (Wyo.

1977). A jury trial has been demanded in this case.

### C. Criminal Restitution

On May 6, 2013, this Court sentenced Plake and ordered restitution in the amount of

$1,693,704.77 to be paid joint and several with his co-defendant, Cardwell. *See* Docket

Report for 12-CR-81-F, Doc. #64. This order warrants discussion in light of the pending civil judgment against Plake and Cardwell.

"The purpose of restitution 'is not to punish defendants or to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.'" *United States v. Speakman*, 594 F.3d 1165, 1177 (10th Cir. 2010) (quoting *United States v. Serawop*, 505 F.3d 1112, 1124 (10th Cir. 2007). Accordingly, "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim . . ..") 18 U.S.C. § 3664(j)(2); *see also United States v. Gallant*, 537 F.3d 1202, 1250 (10th Cir. 2008) (holding that defendants were required to pay restitution despite private settlement agreement but that the sentencing court must nevertheless reduce the restitution received by the victim); *United States v. Parsons,* 141 F.3d 386, 393 (1st Cir.1998) (concluding restitution does not permit a victim to recover twice for the same loss); *United States v. Manzer*, 69 F.3d 222, 230 (8th Cir.1995) ("Restitution is not generally appropriate when it would represent double recovery by the victim.").

The Court will not reduce its finding of civil damages owed to PVHC and HealthTech in light of its previous restitution award, nor will the Court alter its restitution order absent a motion from Defendants. The Court is of the view that the burden rests with the defendant

to prove an offset to restitution as a result of compensation paid in a civil proceeding. *See United States v. Johnson*, 2002 WL 1162415 (D. Kan. Apr. 23, 2002) (citing *United States v. Karam*, 201 F.3d 320, 329 (4th Cir. 2000); *United States v. Sheinbaum*, 136 F.3d 443, 449 (5th Cir. 1998)).

## Conclusion

For the reasons set forth above, the Court concludes that PVHC and HealthTech have demonstrated that there are no genuine issues of material fact with regard to their respective claims. Given the lack of any substantive response from either Defendant, PVHC and HealthTech are entitled to summary judgment in their favor as follows:

PVHC's motion for summary judgment on its claims of fraud, intentional misrepresentation and conversion/theft is GRANTED, and PVHC is awarded a total of $847,884.00 as compensatory damages, plus interest, jointly and severally, against Defendants Cardwell and Plake;

HealthTech's motion for summary judgment on its contract claim for breach of the covenant of good faith and fair dealing and breach of fiduciary duty against Defendant Cardwell, and its crossclaim for civil conspiracy against Defendant Plake, is GRANTED, and HealthTech is awarded a total of $143,944.83 as compensatory damages, plus interest, jointly and severally against Defendants Cardwell and Plake;

HealthTech's tort claim for breach of the covenant of good faith and fair dealing is DENIED;

HealthTech's motion for summary judgment on its claim of indemnification against Cardwell is DENIED;

HealthTech's claims for attorney fees incurred in defending against the claims brought by PVHC, and damages for amounts it paid to settle the claims brought by PVHC, are DENIED;

HealthTech's motion for summary judgment on its claim for punitive damages is GRANTED on the elements of the claim, and DENIED at this time as to any award;

IT IS FURTHER ORDERED that PVHC and HealthTech may submit any post-judgment requests for attorneys fees and costs not fixed at a sum certain in accordance with the Local Rules of this district and pursuant to this Order.

Dated this _23_ day of May, 2013.

NANCY D. FREUDENTHAL
CHIEF UNITED STATES DISTRICT JUDGE